1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Jeremy Knorr,                          No. CV-22-00608-PHX-DWL

10                  Plaintiff,              **ORDER**

11   v.

12   Daisy Mountain Fire District, et al.,

13                  Defendants.

14

15          Jeremy Knorr ("Plaintiff") began working as a firefighter for the Daisy Mountain

16   Fire District ("the District") in 1992.  In September 2017, the Daisy Mountain Fire Board

17   ("the Fire Board") adopted a health policy ("the Health Center Policy") that, among other

18   things, required all District employees to take a yearly treadmill test ("Gerkin Protocol

19   Test" or "treadmill test") and receive a Metabolic Equivalent Task ("MET") score—which

20   is a measure of cardiorespiratory and aerobic fitness—of at least 12.

21          In November 2017, Plaintiff injured his Achilles tendon while training for the

22   Gerkin Protocol Test.  In January 2018, Plaintiff took the test, scored below 12, and was

23   reassigned to paid light-duty work and scheduled for a retest.  Plaintiff then began physical

24   therapy for his injury.  In September 2018, Plaintiff received notice that if he did not score

25   above 11 on his retest, he would be suspended without pay and required to retest.  Plaintiff

26   retested, scored below 11, and was suspended without pay.  As these events were

27   unfolding, Plaintiff began raising concerns that the Health Center Policy was

28   discriminatory toward older firefighters.  In February 2019, the District terminated

1    Plaintiff's employment in part because of his inability to pass the Gerkin Protocol Test and

2    in part because he was being "insubordinate."  Finally, in December 2019, Plaintiff was

3    offered the option of reinstatement if he could pass the Gerkin Protocol Test within eight

4    weeks, but he rejected that offer.

5         After unsuccessfully appealing his termination to the Fire Board, Plaintiff brought

6    this action against the District, the Fire Board, and the individual members of the Fire

7    Board (together, "Defendants") for age discrimination and retaliation in violation of the

8    Age Discrimination in Employment Act ("ADEA") and disability discrimination in

9    violation of the Americans with Disabilities Act ("ADA").  Now pending before the Court

10   is Defendants' motion for summary judgment.  (Doc. 71.)  For the reasons that follow, the

11   motion is granted in part and denied in part.

12                                    **BACKGROUND**

13        The background facts below are taken from the parties' summary judgment

14   submissions and other materials in the record and are uncontroverted unless otherwise

15   noted.  Additional facts bearing on the parties' specific summary judgment arguments are

16   addressed in the Discussion portion of this order.

17   I.    Relevant Factual Background

18         A.    **Before The Health Center Policy**

19         Plaintiff began working as a firefighter with the District in 1992, eventually

20   advancing from recruit to captain.  (Doc. 71-2 at 3-4.)

21         On June 18, 2015, Plaintiff underwent a medical examination and the doctor

22   determined that Plaintiff "[m]eets the medical and physical requirements for modified

23   duty" with the restrictions of "[p]rovisional release for 3 months [and] [r]ecommend[ed]

24   exercise program to increase aerobic capacity."  (*Id.* at 56.)  Plaintiff received a MET score

25   of 10.7 on the stress test, which meant that he did "not meet aerobic capacity."  (*Id.* at 57.)[1]

26

27   _____

     [1]    A MET score measures "how much energy we need to do a certain task.  It's a
28   scientific measurement.  And it is related to oxygen and how much oxygen our body is
     using to expend during a certain task.  So the harder a task, the higher the [volume of
     oxygen], the higher the METS."  (Doc. 71-2 at 50 [Hyland deposition].)

In his 2015 performance review, Plaintiff scored 5 out of 5 for work habits, policies and procedures, safety, customer service, and job skills and knowledge and 4 out of 5 for quality and quantity and working relationships.  (Doc. 77-2 at 2-9.)

On June 1, 2016, Plaintiff underwent a medical examination and the doctor concluded that he "[m]eets the medical and physical requirements for full duty with no restrictions."  (*Id.* at 49.)

On April 26, 2017, Plaintiff underwent a medical examination and the doctor concluded that he "[m]eets the medical and physical requirements for full duty with restrictions/concerns": "[d]eficient cardiorespiratory/aerobic fitness.  Currently 9.9 METs.  This is below [f]irefighter standards."  (*Id.* at 50.)  This placed Plaintiff in the "Tier-4 Fitness" category, which was the lowest category and meant that he met the National Fire Protection Association's ("NFPA") "medical standards but d[id] not meet recommended MET/aerobic capacity or fitness/conditioning level per NFPA guidelines.  Refer to individual Department policy regarding work status."  (*Id.*)

B.    **The Health Center Policy**

On September 25, 2017, the Fire Board adopted the Health Center Policy.  (Doc. 71-2 at 13-15.)  The Health Center Policy provided in relevant part that:

> In accordance with N.F.P.A. 1500 & 1582 and OSHA Fire Brigade Rules . . . , all sworn employees of the [District] must have an annual physical examination. . . .  [The District] uses a tiered system to determine your medical and fitness parameters to perform firefighter duties.  This tiered system has a medical and fitness component. . . .  At the same time a member is going through his/her physical examination, he/she will also have a fitness evaluation. . . .  Your annual physical will be scheduled during the month of your birthday on a day that you are on duty, based on health center availability, discretion of the Health and Safety Chief, or other factors.  If for any reason you are unable to make your scheduled appointment, there will be one attempt to reschedule within 30 days of your previously scheduled appointment.  If you do not complete your physical during that time period, you will be removed from active duty and put on a 40-hour assignment until successful completion of your physical.
>
> If you are determined to be Tier 4 fitness, you will be removed from active duty and placed on a 40-hour assignment, or scheduled for a retest within 90

days based on the guidelines in Attachment B. . . .   Resources will be provided to the employee while on a 40-hour assignment, such as peer fitness consultation, and adequate time for exercise when available.

Employees can remain on a 40-hour light duty status for up to six (6) months. . . .   After six (6) months of a 40-hour assignment, the employee's position and their ability to do their job will be reevaluated, and the employee may be subject to the disciplinary process, up to and including termination of employment.

(Doc. 77-2 at 54-56.)

Attached to the Health Center Policy was the "Tier Health Assessment," which stated in relevant part that:

The Tier Health Assessment is a program that places members in a category or tier based on their annual physical. . . .   We use the most current version of the NFPA 1582 standard as our Guide.   However, there are rare instances when we revert back to a previous version of the 1582.   Depending on the nature for these medically unfit determinations, these not-fit-for-duty members were referred to a specialist, provided counsel/advice, prescribed rehabilitation methods all with the goal of returning them back to active duty as soon as possible.

When a member is found to be medically fit but their physical fitness and conditioning is poor or in decline they may be rated as a "Tier 4 fitness" or just have a comment noted on their clearance/certification form.   [Glendale Health Center] does not remove or recommend that members be removed from active duty.   [Glendale Health Center] will advise the Departments designated contact person, however.   The Department will need to have fitness related standards and policies to support removal from field operations for fitness and conditioning related issues. . . .

Tier 4: Health issues sufficient enough to be removed from field operations and possible referral for wellness/fitness intervention.   What does this mean? You are not fit-for-duty, thus may not be cleared to work in the firefighting field.   This determination depends on fitness related policies established by your department.   We will help you resolve your health issues and return you to the firefighting field as soon as possible.

The four metrics used in the Tier Program are: Body Fat percentage, Cardiac Stress Test using the Gerkin Protocol, Blood Sugar Testing during a fasting state, and Blood Pressure.

- 4 -

1  (*Id.* at 58-59, cleaned up.)  The Gerkin Protocol Test "requires the employee to run on a

2  treadmill."  (Doc. 71-4 at 36 ¶ 26.)

3        The Health Center Policy also included a chart of MET levels for each tier,

4  providing that "[t]he tier system is based on current sound evidence based [on] medical[ly]

5  accepted parameters and NFPA 1582":

| Age adjusted MET's level expected of fire members for Tier Management | | | | |
|---|---|---|---|---|
| Age Range | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| < 40 | > 14.0 | 13.0-13.9 | 12.0-12.9 | < 12.0*** |
| 40-49 | > 13.5 | 12.7-13.5 | 12.0-12.6 | < 12.0*** |
| 50+ | > 13.0 | 12.4-13.0 | 12.0-12.3 | < 12.0*** |
| *** Research with firefighters indicates that a minimum aerobic capacity of 12.0 METS is needed for safe fire ground operations. Your Department may have standards and policies that requires you to maintain your fitness at or above this standard. If you fall under 12 METS (VO2 Max 42ml/kg/min) per NFPA 1582 and sound medical rational, you may be removed from active duty.  See Attachment B. | | | | |

(Doc. 77-2 at 60.)  Attachment B provided, in relevant part, that:

> If, after your physical, it has been determined you are a Tier 4 fitness, the
> following process will apply until you can return to full duty:
>
> **Tier 4:**
>
> **<u>&lt;11.0 METs:</u>**
>
> - You will be placed on Light Duty.
> - You will be retested in 60 to 90 days based on Health Center
>   availability or other factors.
> - You may be allowed 1 retest sooner at the discretion of the Health
>   Center and/or Health and Safety Chief (usually no sooner than 30
>   days).
> - Failure of the initial retest may result in peer fitness consultation as a
>   part of the 40-hour assignment.

(*Id.* at 61, emphasis in original.)

      On December 13, 2017, Deputy Chief Dan Jarrett ("Chief Jarrett") notified captains

- 5 -

1    in the District about the Health Center Policy.  (*Id.* at 52.)

2           **C.**      **After The Health Center Policy**

3          On November 6, 2017, Plaintiff injured himself on the treadmill while training for

4    his physical.  (Doc. 71-3 at 13 [workers' compensation claim providing the date of injury].)

5          On January 31, 2018, Plaintiff took the Gerkin Protocol Test and scored a MET of

6    9.3, placing him in Tier 4.  (*Id.* at 7.)

7          On February 5, 2018, Plaintiff began a paid light-duty assignment.  (Doc. 71-2 at

8    65.)  The letter describing this assignment notified Plaintiff that he "will be retested at the

9    health center in approximately May of 2018" and "will be assigned to complete tasks or

10   work on projects for Administration" and other divisions at the District.  (*Id.*)  Plaintiff was

11   informed that he "will be allotted up to two hours per work day for exercise and peer fitness

12   consultation.  Peer fitness resources are available by request."  (*Id.*)  Jensen Schell, who

13   was neither a doctor nor physical therapist, was Plaintiff's peer fitness coordinator.  (Doc.

14   71-4 at 37 ¶ 32.)

15         On February 6, 2018, Schell emailed Plaintiff to offer assistance and resources,

16   including "do[ing] a full questionnaire involving diet and exercise so we can build you a

17   personalized plan to get you on track for your retest."  (Doc. 77-2 at 203.)

18         On February 7, 2018, Plaintiff met with Schell and filled out "Health Risk

19   Assessment Forms."  (*Id.* at 188-91.)  On the forms, Plaintiff noted that "nagging injuries"

20   were "personal barriers to exercise."  (*Id.* at 190.)  Plaintiff also noted that he was "currently

21   being treated for a bone or joint problem that restricts [him] from engaging in physical

22   activity."  (*Id.* at 191.)

23         On February 12, 2018, Plaintiff "underwent a Full Initial Evaluation at OSR

24   Physical Therapy.  [Plaintiff's] diagnoses included Achilles tendonitis in both legs and

25   plant[a]r fascial fibromatosis."  (Doc. 71-4 at 38 ¶ 36.)

26         In mid-February 2018, Plaintiff sought care for his injuries from Dr. Stephen

27   Hammett.  (*Id.* at 10.)  Dr. Hammett referred Plaintiff to physical therapy.  (*Id.*)

28         Throughout February 2018, Schell continued to check in with Plaintiff and offer

resources.  (Doc. 77-2 at 204 [February 9, 2018 email from Schell to Plaintiff with "a basic diet guide"]; *id.* at 201-02 [February 13, 2018 emails between Schell and Plaintiff about workouts suitable for Plaintiff's training for the Gerkin Protocol Test]; *id.* at 205 [February 26, 2018 email from Schell to Plaintiff and other firefighters checking in about training and asking to set up one-on-one meetings].)

On March 5, 2018, Plaintiff received a MET score of 9.01 on a practice Gerkin Protocol Test.  (Doc. 77-2 at 192-93; Doc. 71-4 at 38 ¶ 37.)

On March 27, 2018, Plaintiff was hospitalized and diagnosed with "pain in left hip and thigh, diverticulosis of large intestine, ventral hernia without obstruction, and pain in left leg."  (Doc. 71-4 at 38 ¶¶ 39-41.)

On April 3, 2018, Plaintiff went to physical therapy for "[l]eft sciatic pain."  (Doc. 77-2 at 87.)  The physical therapist reported that Plaintiff experienced "pain in the left buttock and down the lateral thigh into his foot," felt temporary pain reduction after receiving treatment in the ER, but "[n]ow his back hurts as well.  He fell down on the ground a couple times and he has to use a walking stick for walking."  (*Id.*)  The physical therapist noted that Plaintiff had severe limitations in walking, sitting, standing, sleeping, and lifting and mild limitations in bathing and dressing.  (*Id.* at 87-88.)  The physical therapist stated that Plaintiff could not walk for more than five minutes or engage in recreational exercise.  (*Id.* at 87.)

On May 7, 2018, Plaintiff met with Chief Mark Nichols ("Chief Nichols") and Chief Jarrett "to discuss [Plaintiff's] 90-day retest . . . per the Health Center Policy, 105.01."  (*Id.* at 223.)  Although Plaintiff was scheduled to retake the Gerkin Protocol Test on that date, he did not do so and the test was rescheduled for August 7, 2018.  (*Id.*)[2]  Plaintiff "was informed that he would continue to be allotted up to 2 hours per work day for exercise and additional peer fitness counseling at his discretion.  It was also reiterated that at the end of

---

[2]     The parties dispute why Plaintiff's May 2018 retest was postponed.  Defendants argue that Plaintiff "did not retake the fitness test in May 2018 because he knew he would not pass."  (Doc. 71 at 4.)  Plaintiff responds that "the next test was postponed but not, as Defendants claim, because Plaintiff did not believe he would pass, but because the District was concerned about spending additional money to pay for his test."  (Doc. 77 at 6.)

180 total days on 40-hour assignment, [Plaintiff] may be subject to the disciplinary process per the Health Center Policy." (*Id.*)[3]

On May 9, 2018, Plaintiff had physical therapy and "the plan was to add more functional lifting and work specific activities because he was to return to work in three months." (Doc. 71-4 at 39 ¶ 45.)

On May 31, 2018, Plaintiff went to physical therapy and "jogged across the street to avoid being hit by a car, during which he felt his left knee was going to give out. The plan was to continue with the existing plan and to add in more functional lifting." (*Id.* at 39 ¶ 49.) Plaintiff's May 2018 "fitness protocol worksheet" noted that he "is injured . . . [and] in P.T." (Doc. 77-2 at 198, capitalization omitted.)

In the summer of 2018, while Plaintiff remained on a paid light-duty assignment, he met with Administrative Chief David Maxwell ("Chief Maxwell"). (*Id.* at 45 ¶ 10; *id.* at 123.)[4] According to Plaintiff, Chief Maxwell "raised my either retiring or leaving the District. He showed me on his laptop a District spreadsheet. He said the District could hire two (2) new, younger employees for the same salary I was being paid." (*Id.* at 45 ¶ 10.)[5]

On June 20, 2018, Schell texted Plaintiff asking to set up a "treadmill test," and Plaintiff responded that he was "not clear to run yet." (*Id.* at 209.) Additionally, Plaintiff's June 2018 "fitness protocol worksheet" stated that Plaintiff is "not cleared to run," "[d]enied other assessments," and "is still in P.T." (*Id.* at 199, capitalization omitted.)

On July 5, 2018, Plaintiff went to physical therapy with "the plan . . . to start return-to-work activity." (Doc. 71-4 at 39 ¶ 50.)

On July 16, 2018, Plaintiff went to physical therapy. (*Id.* at 39 ¶ 51.) Plaintiff experienced "some discomfort in firefighter-training drills and . . . his cardiovascular

---

[3]    On May 22, 2018, Plaintiff signed the agreement memorializing what was discussed at this meeting. (Doc. 71-4 at 39 ¶ 46.)

[4]    Neither Plaintiff nor Defendants provide the specific date of this meeting.

[5]    Chief Maxwell testified that "[i]t's possible" he spoke with Plaintiff about personnel costs but did not "recall a specific conversation." (Doc. 77-2 at 179.)

endurance needed work due to severe deconditioning." (*Id.*)

On July 23, 2018, Plaintiff's physical therapy focused "on cardiovascular endurance" rather than firefighter drills. (*Id.* at 39 ¶ 52.)

On July 25, 2018, Plaintiff resumed firefighter drills. (*Id.* at 39 ¶ 53.)

On July 30 and August 1, 2018, at physical therapy, Plaintiff's "firefighter drills were continuing with increasing endurance with the [Gerkin Protocol Test]." (*Id.* at 39 ¶ 54.) Plaintiff's July 2018 "fitness protocol worksheet" stated that he was "offered 2 different days to meet for treadmill/stair master with no attendance . . . [and] is still in P.T." (Doc. 77-2 at 200, capitalization omitted.)

In August 2018, Plaintiff was scheduled to retake the Gerkin Protocol Test. (Doc. 71-4 at 10.) The parties dispute whether Plaintiff took the test: Plaintiff contends he did and failed (*id.*) whereas Defendants contend he did not take the test (Doc. 71 at 5).

On August 23, 2018, Schell emailed Plaintiff with recommendations for exercises and stretching. (Doc. 77-2 at 206.)

On August 27, 2018, Plaintiff was discharged from physical therapy with the records noting "that there was no limitation on walking, he ambulated with a normal gait pattern, he had normal Achilles reflex." (Doc. 71-4 at 40 ¶ 57.)

On September 4, 2018, Plaintiff received a "Last Chance Agreement," which provided that:

> This memo is a last chance agreement that outlines the compliance criteria regarding you returning to active duty for employment as a firefighter with the Daisy Mountain Fire Department (DMFD). This agreement is the result of your failure to meet the Health Center Policy 105.01 Compliance Tier system.
>
> As agreed upon in the meeting that was held on August 30, 2018; below are the different perimeters and outcomes in which this agreement is written.
>
> 1. If on Thursday, September 6, 2018 you pass your physical reevaluation with a MET's score of 12 or greater, you will be returned to shift work at the most appropriate time scheduling will allow.

2.   If on Thursday, September 6, 2018 the results of your reevaluation show a MET's score of less than 12 but greater than 11, you will be rescheduled to return to shift work for a period of thirty (30) days, after which you will be rescheduled for a retest of your physical.

   a.   If you successfully pass with a score greater than 12, you will return to regular duty.

   b.   If the 30-day rescheduled evaluation produces a MET score of less than 12, you will be removed from active shift work and suspended without pay and will be subject to further disciplinary action, up to and including termination.

3.   If on Thursday, September 6, 2018 the results of your reevaluation show a MET's score of less than 11 you will be suspended without pay for a period not to exceed ninety (90) days.  You may choose to use your sick/vacation accruals during this time.  While you are suspended you will not accrue sick and vacation.  At the end of this ninety (90) day period, you will be rescheduled for a retest.

   a.   If you successfully pass with a score greater than 12, you will return to regular duty.

   b.   If the 90-day rescheduled evaluation produces a MET score of less than 12, but greater than 11, you will be rescheduled to return to shift work for a period of thirty (30) days, after which you will be rescheduled for a retest of your physical.

      i.   If the 30-day rescheduled evaluation produces a MET score of less than 12, you will be removed from active shift work and suspended without pay and will be subject to further disciplinary action, up to and including termination.

4.   You fail to show up and take your scheduled evaluation.  You will then be immediately suspended without pay.  The Personnel Board will meet in accordance to Employee Discipline policy 102.04A to determine what applicable discipline will be applied up to and including termination.

1   (Doc. 71-3 at 4-5, cleaned up.)[6]

2         On September 6, 2018, Plaintiff retested and scored a MET of 10.5.  (*Id.* at 7.)

3   Plaintiff was referred to the disciplinary board and scheduled for a final retest on November

4   20, 2018.  (*Id.*)

5         On September 7, 2018, Plaintiff "was transported and admitted to JCL Deer Valley

6   hospital, where his diagnoses were bradycardia unspecified, syncope and collapse,

7   headache, and gout.  He was discharged the following day."  (Doc. 71-4 at 40 ¶ 61.)

8         That same day, Plaintiff notified Schell that he did not pass the Gerkin Protocol

9   Test, and Schell responded with encouragement and offered to help with Plaintiff's training

10  for the next retest.  (Doc. 77-2 at 207.)

11        On September 18, 2018, Plaintiff emailed Schell asking if he "[had] any information

12  on the Health Center walking treadmill test."  (*Id.* at 127.)  Schell replied the same day:

13        I do not have the specifics of the walking test but I will send some emails to
          the health center to ask for it.  I know the health center states that through
14        their experience there are not many positive outcomes with the treadmill test
          MET wise.  I do know a few members have taken it and passed and a few
15        have failed so I would urge you to reach out to them regarding the specifics
          of the test until I get concrete numbers.  I will also urge you to keep training
16        hard for the jog test for overall health and cardiac improvement regardless of
          what test you decide to take.  I understand passing is very important but being
17        as healthy as possible will improve your life and your test results.  Please
          reach out to me if you would like to do some workouts or MET practice runs.
18

19

20  (*Id.*)

21        On September 27, 2018, Plaintiff "had an Initial Evaluation with Harper Physical

22  Therapy at which time his diagnoses included pain in left ankle and foot and Achilles

23  tendinitis in left leg.  He reported that his symptoms had been increasing over the last month

24  as he had been trying to train/run for an upcoming firefighter physical-performance test."

25  (Doc. 71-4 at 41 ¶ 64.)

26

27  ───────────────────
    [6]    Plaintiff asserts that at this meeting, "Chief Nichols accused me of lying about or
28  embellishing my injuries.  I offered to provide him additional medical information but he
    told me he did not want it."  (Doc. 77-2 at 45 ¶ 9.)

On October 20, 2018, Plaintiff reported that he sustained an injury on a treadmill on November 6, 2017.  (Doc. 77-2 at 115-16.)[7]

On October 22, 2018, Plaintiff filed a workers' compensation claim with an insurance company.  (Doc. 71-3 at 13-14.)  Plaintiff stated that he injured his foot on November 6, 2017 while exercising in preparation for the annual physical.  (*Id.* at 13.)  In response to the question "[h]ow can the fire district help to avoid this type of accident," Plaintiff stated: "[R]easonable expectations and policy[,] professional fitness providers."  (*Id.* at 14, capitalization omitted.)

On October 23, 2018, Plaintiff emailed a District employee that in the fall of 2017, he "injured [his] foot from the continued stress of exercise."  (Doc. 77-2 at 112-14 [Plaintiff describing the email during his deposition].)

On November 1, 2018, Plaintiff filed a "worker's report of injury" with the Arizona Industrial Commission.  (Doc. 71-3 at 12, capitalization omitted.)  Plaintiff stated that on November 6, 2017, "during physical fitness training on duty [I] strained my left foot/leg/back especially when running on treadmill as required.  Injury appeared minor at first, but got worse over time."  (*Id.*, capitalization omitted.)

On November 2, 2018, Dr. William Fishco evaluated Plaintiff "for pain in his Achilles tendon and back of his left heel.  [Plaintiff] reported that he was 'now required to do a lot of running with the fire department.'  [Plaintiff] explained that since he had been running, his left foot pain had been a big problem.  [Plaintiff] reported that he had participated in physical therapy which helped.  Dr. Fishco's records also state '[h]e had a similar problem dating back to 2009 and says it was all work-related.'"  (Doc. 71-4 at 11, emphasis omitted.)  Dr. Fishco examined Plaintiff, "confirmed normal pain-free range of motion of the ankle, subtalar, and midtarsal joints," and noted that Plaintiff experienced pain "with palpation of the posterior aspect of the left heel . . . [and] to the distal Achilles tendon."  (*Id.*)  Dr. Fishco diagnosed Plaintiff with "left Achilles tendonitis, transient synovitis, pain in left foot" and "provided a work release that included no running."  (*Id.*)

---

[7]    Plaintiff does not specify who received this report.

On November 8, 2018, Plaintiff emailed Chief Nichols:

> At this point I am still injured and have not been able to prepare for my next Treadmill Test that the department has scheduled on November 20th, 2018. I'm not sure where any of this stands and what my current responsibilities and obligations are to this situation and I am asking for your direction and expectations of me at this time.

(Doc. 77-2 at 225.)

On November 30, 2018, Plaintiff emailed Chief Nichols with the subject line "Request of Consideration":

> I am asking for you to consider my side of this situation, my current department standing or status and my future with the [District]. Please put yourself in my shoes.
>
> 1- I don't believe that discipline or Leave Without Pay was anybody's intention or the reason for this NEW Health & Fitness Policy.
>
> 2- I don't feel that I am being treated fairly or with consideration of me and my circumstances in this situation.
>
> 3- I disagree with being put on leave without pay. This discipline has gone from non-punitive to one step below dismissal for no reason and without any progressive disciplinary steps.
>
> 4- I am asking to be put back on a regular pay status.
>
> 5- I am asking for my sick and vacation time accruals back.
>
> [6]- I am asking for my lost or used sick and vacation time back.
>
> 7- A reasonable plan for my success and for me to have a chance at regaining back my health, fitness and back on the truck status.
>
> [8]- I would like to see some rethinking and/or reform put into this new policy and in how it is managed.
>
> I would prefer to work this out amicably with you as my supervisor, otherwise consider this my notification to request to appeal this situation to the Fire Board for a public hearing and consideration.
>
> Thank you for your time, consideration and understanding.

(Doc. 71-3 at 19-20.)   Additionally, Plaintiff asserted in an interrogatory response that when he was "given the opportunity to elaborate" on this email during an unidentified follow-up conversation with Chief Nichols, he "explained that the physical fitness policy discriminates against older employees because employees over 50, such as himself, are expected to maintain the same minimum METs score as employees in their 20s." (*Id.* at 23-24.)

On December 4, 2018, "Dr. Fishco noted that [Plaintiff] was about 50% better following the taper dose of prednisone.  Dr. Fishco's orthopedic examination noted less pain with palpation of the posterior aspect of the left heel.  There was still mild pain at the distal Achilles attachment and retro bursa area. . . .  [Plaintiff] reported that the same work restrictions were continued that included no running." (Doc. 71-4 at 11.)

On December 18, 2018, the insurance company denied Plaintiff's workers' compensation claim. (Doc. 71-3 at 16-17.)  Plaintiff did not appeal. (Doc. 71-4 at 42 ¶ 71)

On December 20, 2018, Chief Nichols, Plaintiff, and Plaintiff's union representative met to discuss Plaintiff's November 30, 2018 email. (Doc. 71-3 at 29 [email from Chief Nichols setting the meeting].)

On January 10, 2019, Chief Nichols, Plaintiff, and Plaintiff's union representative met to discuss what Chief Nichols identified as Plaintiff's options—either retire on March 10, 2019 "or go into a one year leave of absence.  If the leave of absence is chosen all payroll and benefits will end effective immediately." (Doc. 77-2 at 215.)  Chief Nichols emailed a recap of the meeting, which included details of the retirement agreement and informed Plaintiff that "[i]f the decision is not to enter into retirement, then notification of investigation (NOI) will be completed with the intent for demotion to the rank of firefighter.  [Plaintiff] will then be removed from the [District] payroll and placed on a year leave of absence." (*Id.*)  That same day, Chief Nichols gave Plaintiff a document entitled "Notice of Investigation" ("NOI"). (*Id.* at 19-21, 216-17.)[8]  The NOI informed Plaintiff

_____

[8]      The signature block on this document is dated "10/1/19" (Doc. 77-2 at 217), but in his deposition, Chief Nichols clarified that the date should be January 10, 2019 (*id.* at 20).

that he was being investigated for five reasons and outlined his rights to representation throughout the investigation:

> 1.   On several dates, you have posted Facebook statements that does not create good order outside the Fire District
>
> 2.   The Facebook postings and comments related to [the District's] relationship with Black Canyon City have been detrimental and harmful in that relationship.
>
> 3.   You have used your position as a Fire Captain with [the District] to attempt to sway the membership and public to side with your violation of our policy on physical fitness.
>
> 4.   This is the second time that the department has had to address your public comments that are unbecoming of a first line supervisor of this organization.
>
> 5.   Failure to conduct yourself to reflect positively as a supervisor when posting Facebook comments that involved Black Canyon City.

(*Id.* at 216-17.)

On January 15, 2019, Plaintiff sent Chief Nichols an email that resembled Plaintiff's November 30, 2018 email:

> ***OK, at this time I am declining your offer and any decision to retire at this time.  I am choosing to adhere to my previous requests outlined in my email sent to you on 11/30/18 as follows;***
>
> 1- I don't believe that discipline or Leave Without Pay was anybody's intention or the reason for this NEW Health & Fitness Policy.
>
> 2- I don't feel that I am being treated fairly or with consideration of me and my circumstances in this situation.
>
> 3- I disagree with being put on leave without pay.  This discipline has gone from non-punitive to one step below dismissal for no reason and without any progressive disciplinary steps.
>
> 4- I am asking to be put back on a regular pay status, ***40 or 56 hour***.
>
> 5- I am asking for my sick and vacation time accruals back ***effective 9/6/18***.
>
> 6- I am asking for my lost or used sick and vacation time back ***effective***

***9/6/18.***

7- A reasonable plan for my success and for me to have a chance at regaining back my health, fitness and back on the truck status.

8- I would like to see some rethinking and/or reform put into this new policy and in how it is managed.

I would prefer to work this out amicably with you as my supervisor, otherwise consider this my notification request to appeal this situation to the Fire Board for a public hearing and consideration.

***If you [cannot] agree to the above items and terms, then again consider this my request as previously requested on 11/30/18 to appeal all your decisions, actions and inactions over the past year to the Daisy Mtn. Fire Board for a hearing and [c]onsideration at a public meeting.***

***If you choose to stop my pay and benefits, I am requesting FMLA, COBRA and Long Term Disability Benefits from the department as I have requested before.  I will be filing for unemployment benefits as well.***

(*Id.* at 227-28, emphasis added.)

On January 17 or 19, 2019,[9] Plaintiff received a letter stating that his Gerkin Protocol Test was scheduled on January 24, 2019 and informing him of the disciplinary consequences, including termination, if he did not show up or achieve a MET score of at least 12.  (Doc. 71-4 at 42 ¶ 73; Doc. 77-2 at 219.)

On January 22, 2019, Plaintiff replied to Chief Nichols that he was "not going to make the Treadmill Test you scheduled on Thursday.  Your notice is severely short and I do not believe that I am cleared by my doctor for that."  (Doc. 77-2 at 220.)

On February 14, 2019, Chief Nichols informed Plaintiff that there would be a mandatory meeting at the District office on February 21, 2019 and that he had notified Plaintiff's labor representative and District representatives.  (Doc. 71-3 at 41.)

On February 20, 2019, Schell notified Chief Jarrett that a lot of people wanted to take the walking treadmill test.  (Doc. 77-2 at 130.)  Schell requested more information about that test.  (*Id.*)

---

[9]     The specific date has no bearing on the summary judgment analysis.

On February 21, 2019, Mark Hyland, the Director of Clinical Operations for the facility administering the Health Center Policy (Doc. 65-1 at 11-12), emailed Schell and Chief Jarrett regarding the walk test.  (Doc. 77-2 at 129.)  Hyland explained that the facility offered the walk test "on very rare occasion . . . approximately 10x . . . only with members who have a legitimate chronic lower extremity issue that they/we do not want to aggravate.  There is a perception the test is easier or at least easier to hit your METS.  It is not.  In fact in many ways it is more difficult and we are finding that it may not be a good option even for members who have chronic . . . ailments.  Most people who take the test do fall under their METS (these typically are members who are less fit anyway) just as they would on our standard Gerkin protocol.  As you know the Gerkin protocol was specifically developed for use with public safety/firefighters. . . .  We address [the walk test] only when asked about it or it is requested by a member . . . [and] will not be offering the [walk test] to anyone.  I will be issuing a statement to all of our clients soon indicating the walking test will not [sic] longer be offered at [the health center]."  (*Id.*)

That same day, Chief Jarrett and Hyland discussed the walk test over the phone and exchanged emails.  (*Id.* at 131.)  Chief Jarrett sent an email summarizing their discussion and copied Chief Nichols.  (*Id.*)  It stated that although "the running test is the default preferred test," the District would keep the walk test as an option for employees but would allow Hyland's staff to determine whether it was medically safe in each particular case.  (*Id.*)

Also on February 21, 2019, Plaintiff received a "Memo of Termination" explaining that he was being "terminated for violations of department work rules and regulations regarding the following policies arising from your failure to comply with the terms of the September 4, 2018 Last Chance Agreement."  (*Id.* at 230.)  The document identified six rules and regulations that Plaintiff had violated:

**Employee Expectations, Sections: 3, 4, 9, 12, 14, 15**

3.    Always conduct themselves to reflect themselves positively on the District on and off duty.

- 17 -

> 4. Follow instructions of a supervisor in a positive, cooperative manner. Manage in an effective, considerate manner as a supervisor.
>
> 9. Keep themselves physically fit.
>
> 12. Follow the operations manuals and written directives of the Daisy Mountain Fire District.
>
> **<u>EMPLOYEE SHALL NOT</u>:**
>
> 14. Be insubordinate as defined by failure to comply with directives, except if it involves unlawful, unreasonable, and/or safety risk orders.
>
> 15. Fail to perform job duties as assigned.

(*Id.*) Plaintiff appealed his termination. (Doc. 71-4 at 4 [Plaintiff's appeal raised during a Fire Board meeting].)

On March 27, 2019, Dr. Fishco evaluated Plaintiff and "documented that 'he is doing much better overall but still having pain essentially if he tries to run. . . . He is concerned because in order to keep his job at the fire station, he needs to pass his physical training test. At this time, he cannot do that because of the Achilles pain.'" (*Id.* at 11.) "Dr. Fishco's orthopedic examination noted less pain with palpation of the posterior aspect of the left heel. There was mild pain noted at the distal Achilles tendon and at the attachment site. Pain was noted to be along the plantar medial heel. . . . The working diagnosis remained the same, with the addition of plantar fasciitis and equinus contraction. Dr. Fishco recommended continuation of avoiding high impaction-type activities." (*Id.* at 11-12.)

On April 22, 2019, the Fire Board heard Plaintiff's appeal and requested that Plaintiff participate in an additional health evaluation. (*Id.* at 2-4, 6.)

On May 8, 2019, Dr. Fishco evaluated Plaintiff again. (*Id.* at 12.) Plaintiff "reported his Achilles was doing much better, and he was having much less pain. He also reported that he had been 'walking two to three miles a day.' Dr. Fishco's assessment remained the same." (*Id.*)

On May 16, 2019, Plaintiff "had a second 'Initial' Evaluation with Harper Physical

Therapy at which time his assessment included Achilles tendinosis in left leg.  Between May 16 and September 8, 2019, [Plaintiff] had fourteen physical therapy sessions with Harper."  (*Id.* at 43 ¶ 83.)

On June 6, 2019, Dr. William Leonetti evaluated Plaintiff "[t]o determine [his] current left ankle condition as it relates to his reported work injury of 11/06/2017" and "[t]o determine if [his] current left Achilles symptomatology would prevent him from preparing for and/or successfully passing his required physical evaluation."  (*Id.* at 9.)  Dr. Leonetti diagnosed Plaintiff with chronic obesity, unusually tight hamstring and Achilles muscles, heel spur, Achilles tendonitis, and "[s]evere limitation of inversion and eversion motion." (*Id.* at 15.)  Dr. Leonetti concluded that Plaintiff's "current symptomatology prevent[s] him from preparing for and successfully passing his required physical evaluation" because "[i]n all medical probability, his current symptoms are a direct result of preexisting factors . . . and an overuse syndrome of his left Achilles tendon from performing a running style exercise which he was much too deconditioned to participate in."  (*Id.*)

On June 17, 2019, Dr. Leonetti reported that Plaintiff's "left heel symptomatology is a direct result of" his preexisting factors, including "[s]evere obesity," "[o]verall total body deconditioning," tight hamstring, different limb lengths, "excessive strain on the left Achilles tendon," and "[c]hronic preexisting Achilles tendinosis."  (*Id.* at 73-74.)  Dr. Leonetti "recommend[ed] that [Plaintiff] be provided one more opportunity to pass his firefighter's 'stress test.'  [Plaintiff] should have at least eight weeks of additional training prior to taking the test."  (*Id.* at 74.)  Dr. Leonetti also provided specific recommendations for heel lifts, physical therapy, medications, and exercises for Plaintiff.  (*Id.* at 74-75.)  Dr. Leonetti added that "[i]f for any reason [Plaintiff] is not able to tolerate and pass the test due to left heel pain, in all medical probability the 'stress test' is a physical goal that will probably never be met."  (*Id.* at 75.)

On September 8, 2019, Plaintiff was discharged from physical therapy "due to lack of compliance."  (Doc. 77-2 at 92.)

On December 12, 2019, Plaintiff received an application for disability retirement

from the District.  (Doc. 71-4 at 54.)

On December 16, 2019, the Fire Board discussed Plaintiff's appeal and offered to reinstate Plaintiff by no later than December 23, 2019 "under the proposal reached in consensus in executive session."  (*Id.* at 21.)  Among other things, the proposal would require Plaintiff to complete another Gerkin Protocol Test in eight weeks after reinstatement  (*Id.* at 44 ¶ 91.)[10]  Plaintiff's attorney at the time appeared on Plaintiff's behalf and asked for time to consider the offer.  (*Id.* at 22.)

On December 17, 2019, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 1 ¶ 23.)

On December 20, 2019, Plaintiff (through counsel) rejected the Fire Board's reinstatement offer.  (Doc. 71-4 at 24.)

On February 24, 2020, the Fire Board upheld Chief Nichols' decision to terminate Plaintiff.  (*Id.* at 26-27.)  The District notified Plaintiff of the decision the following day and of his right to appeal.  (*Id.* at 30.)

On March 17, 2020, Plaintiff's counsel requested an appeal before the Arizona Office of Administrative Hearings ("OAH").  (*Id.* at 32.)

On March 12, 2020, Plaintiff applied for disability retirement with the Public Safety Personnel Retirement System ("PSPRS").  (Doc. 71-2 at 8-9.)  Plaintiff listed the date of the disabling event as February 20, 2019.  (*Id.* at 9.)

On April 28, 2021, as part of his claim for disability retirement, Plaintiff was evaluated by a medical professional and "reported that his injury occurred between 2018 and 2019, but the doctor concluded that his specific injury occurred in November 2019." (Doc. 71-4 at 44-45 ¶ 95.)

On August 4, 2021, PSPRS approved Plaintiff's application for "accidental disability."  (*Id.* at 45 ¶ 96.)

On December 6, 2021, after holding a hearing (*id.* at 34 ¶¶ 3-4), OAH denied Plaintiff's appeal and upheld his termination.  (*Id.* at 47.)

---

[10]     The record does not provide additional details concerning the proposal.

II.   Procedural History

On April 13, 2022, Plaintiff initiated this action by filing the complaint.  (Doc. 1.) Count One alleges age discrimination and retaliation in violation of the ADEA and Count Two alleges disability discrimination in violation of the ADA.  (*Id.* at 7-8.)

On December 8, 2023, Defendants filed a motion for summary judgment.  (Doc. 71.)  The motion later became fully briefed.  (Docs. 77, 78.)

On September 11, 2024, the Court issued a tentative ruling.  (Doc. 83.)

On September 13, 2024, the Court heard oral argument.  (Doc. 84.)

## DISCUSSION

I.   Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks and citation omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have

enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   ADEA Claims

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" when such individual is "at least 40 years of age." 29 U.S.C. §§ 623(a), 631(a). In Count One of the complaint, Plaintiff asserts ADEA claims for discrimination and retaliation.

A.   **Discrimination**

"A plaintiff in an employment discrimination case can proceed under two theories of employment discrimination: disparate treatment and disparate impact. Disparate treatment is demonstrated when the employer simply treats some people less favorably than others because of a protected characteristic. Disparate impact is demonstrated when employment practices that are facially neutral in their treatment of different groups fall

1  more harshly on one group than another and cannot be justified by business necessity."

2  *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1049 n.1 (9th Cir. 2012) (cleaned up).

3  Here, Plaintiff seeks to proceed under both theories: "[T]here is significant evidence that

4  he was specifically treated differently than similarly situated younger employees and also

5  that the District's policy had a disparate impact on older workers."   (Doc. 77 at 11,

6  capitalization omitted).

7                  1.   <u>Disparate Treatment</u>

8                     a.   **The Parties' Arguments**

9        Defendants argue that Plaintiff "does not allege the necessary elements for a

10  disparate treatment discrimination claim under the ADEA."   (Doc. 71 at 11.)   More

11  specifically, Defendants argue that although Plaintiff "is a member of a protected class

12  because he is more than 40 years old . . . he does not allege he could satisfactorily perform

13  his job" and "does not allege that the District replaced him with a younger employee with

14  equal or inferior qualifications."  (*Id.* at 10-11.)

15        As for satisfactory performance, Plaintiff responds that "he performed his job well

16  with the same or similar physical fitness METs score before the District's new test."  (Doc.

17  77 at 12.)   As for the younger-comparator element, Plaintiff contends that "this is not a

18  termination and replacement case; rather, the District treated Plaintiff differently than a

19  similarly situated and substantially younger firefighter," M.T., "*while Plaintiff was still*

20  *employed*, and the different treatment continued up to his termination."  (*Id.*, emphasis in

21  original.)  The differential treatment, according to Plaintiff, involved (1) allowing M.T. "to

22  take the treadmill test on six (6) occasions over 19 months"; (2) allowing M.T. to perform

23  "paid light duty assignments that Plaintiff could have easily performed"; and (3) affording

24  M.T. "a total combination of" paid light-duty work and unpaid leave that was "considerably

25  longer than Plaintiff."  (*Id.* at 13.)   Finally, Plaintiff contends that Chief Maxwell, "who

26  was also involved in the steps leading to Plaintiff's discharge made it clear that the District

27  would benefit from hiring younger employees and Plaintiff leaving."  (*Id.*)

28        In reply, Defendants argue that Plaintiff "does not provide any evidence that he

received positive performance reviews or achieved a satisfactory METs score after January 2018." (Doc. 78 at 2.) Defendants also argue that Plaintiff lacks direct or circumstantial evidence of age discrimination. (*Id.* at 3-4.) As for direct evidence, Defendants argue that Chief Maxwell's statement "is immaterial . . . [and] insufficient for the factfinder to infer that an age discriminatory attitude was more likely than not the motivating factor in the District's decision" for two reasons: first, because Plaintiff is not pursuing a "termination and replacement case" yet Chief Maxwell's alleged statement only pertains to termination; and second, because Chief Maxwell "was not the person who made the decision to terminate [Plaintiff's] employment." (*Id.* at 3.) As for circumstantial evidence, Defendants argue that "[h]ow the District treated [M.T.] (in comparison to how it treated [Plaintiff]) does not establish a *prima facie* case of discrimination because the District treated them the same" and "[t]he only difference is that [M.T.] took a leave of absence from the District to try and improve his physical fitness, whereas [Plaintiff] rejected the District's offer that he also take a leave of absence." (*Id.* at 4.) Finally, Defendants argue that even if Plaintiff established a prima facie case of discrimination, his claim still fails because (1) "[t]he District also had a legitimate, non-discriminatory reason for terminating [Plaintiff's] employment"; and (2) Plaintiff has not established "that the District's reason was a pretext for discrimination." (*Id.* at 4-5.)

### b. **Analysis**

"Under a disparate treatment theory of discrimination, a plaintiff in an ADEA case can establish age discrimination based on: (1) circumstantial evidence of age discrimination; or (2) direct evidence of age discrimination." *Sheppard*, 694 F.3d at 1049 (cleaned up). "[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993).

### i. Direct Evidence

"Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be

viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (cleaned up). "When a plaintiff alleges disparate treatment based on direct evidence in an ADEA claim, we do not apply the burden-shifting analysis set forth in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Enlow*, 389 F.3d at 812.

Here, Plaintiff's only proffered piece of direct evidence of discriminatory intent is an age-related remark by Chief Maxwell during a meeting with Plaintiff in the summer of 2018. According to Plaintiff, Chief Maxwell "call[ed] [Plaintiff] out of nowhere to have lunch with him and he want[ed] to know what [Plaintiff's] retirement plans [were] and then he t[ook] [Plaintiff] back to his office and show[ed] [Plaintiff] the difference in [Plaintiff's] pay versus what they could pay two brand new firefighters for." (Doc. 77-2 at 122. *See also id.* at 45 ¶ 10.) According to Plaintiff, Chief Maxwell never had "[a]ny follow-up to that." (*Id.* at 123.)

Although direct evidence of discriminatory intent "need be 'very little,'" *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998), the evidence must involve conduct or statements by a "person[] involved in the decision-making process." *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023) (citation omitted). Here, the record is devoid of evidence that Chief Maxwell was involved in the relevant decisionmaking process.

As an initial matter, Plaintiff clarified in his response brief that "this is not a termination and replacement case; rather, the District treated Plaintiff differently than a similarly situated and substantially younger firefighter *while Plaintiff was still employed*." (Doc. 77 at 12, emphasis in original.) Plaintiff then identified three ways in which he was allegedly subjected to disparate treatment in relation to his younger coworker M.T.: (1) being offered fewer opportunities to retake the Gerkin Protocol Test after initially failing the test; (2) not being allowed to perform certain tasks after being placed on a light-duty assignment in the aftermath of the failed test; and (3) being offered a relatively shorter

1  "total combination of" paid light-duty work and unpaid leave in the aftermath of the failed

2  test. (*Id.* at 13.)

3      Given this clarified theory of liability, Chief Maxwell's statement could only qualify

4  as direct evidence of discriminatory intent if Chief Maxwell was involved in the

5  decisionmaking processes that led to the alleged disparate treatment, *i.e.*, the processes for

6  determining how many opportunities Plaintiff should be given to retake the Gerkin

7  Protocol Test after initially failing the test, whether Plaintiff should be allowed to perform

8  certain tasks after being placed on a light-duty assignment in the aftermath of the failed

9  test, and/or how much overall paid light-duty work and unpaid leave to allow Plaintiff to

10  take in the aftermath of the failed test.  However, Plaintiff's brief makes no effort to show

11  that Chief Maxwell was involved in any of those processes.  To the contrary, the only

12  assertion regarding Chief Maxwell's involvement in any decisionmaking process is that

13  Chief Maxwell was "involved in the steps leading to Plaintiff's *discharge*."  (Doc. 77 at

14  13, emphasis added.)  Putting aside the fact that, as discussed in more detail below, this

15  assertion is unsupported by the record, it is not tethered to Plaintiff's now-narrowed theory

16  of liability because it merely seeks to demonstrate Chief Maxwell's involvement in a

17  decisionmaking process as to which Plaintiff has now disavowed any disparate-treatment

18  challenge.  *Cf. Britto v. City of Poplar Bluff, Mo.*, 2000 WL 516208, *3 n.1 (E.D. Mo.

19  2000) ("In this case, the decisionmakers were Mr. Babgy, Mr. Lawson and the City

20  Council.  Since Plaintiff has neither alleged nor presented evidence of any direct evidence

21  statements or conduct by any of these individuals, her claim will be analyzed under the

22  indirect evidence framework."); *Roy v. Laborer's Loc. 737*, 2020 WL 8836073, *10 (D.

23  Or. 2020), *report and recommendation adopted as modified sub nom. Roy v. Laborers'

24  Loc. 737*, 2021 WL 395760 (D. Or. 2021), *aff'd sub nom. Roy v. Laborer's Loc. 737*, 2021

25  WL 5985031 (9th Cir. 2021) ("[T]here is no evidence that Macauley was 'involved with

26  that particular matter' about which her statement was made or that she was 'involved in a

27  process leading up to the challenged decision' to terminate plaintiff's employment.").

28      The Court also notes that, based on its independent review of the record, there is no

evidence that Chief Maxwell was involved in the decisionmaking processes regarding how many times Plaintiff should be allowed to retake the test after failing it, whether Plaintiff should be allowed to perform certain tasks after being placed on a light-duty assignment in the aftermath of the failed test, and how much overall paid light-duty work and unpaid leave to allow Plaintiff to take in the aftermath of his failed test.  The first relevant processes occurred in January and February 2018, when Plaintiff received a letter notifying him of his placement on a paid light-duty assignment and the plan for retesting him.  (Doc. 71-2 at 65.)  The letter is signed by Chief Jarrett and mentions Chief Nichols.  (*Id.*)  There is no mention of any involvement by Chief Maxwell in these decisions.  (*Id.*)  Next, in May 2018, Chief Jarrett and Chief Nichols met with Plaintiff to discuss the extension of his paid light-duty assignment and further retesting plans and then memorialized those decisions in a letter.  (Doc. 77-2 at 223.)  The letter does not mention any involvement by Chief Maxwell in these decisions.  (*Id.*)  Next, in September 2018, Plaintiff received the "Last Chance Agreement," which discussed the next stages of Plaintiff's leave and further retesting plans.  (Doc. 71-3 at 4-5.)  This document was written and signed by Chief Nichols.  (*Id.*)  It does not mention any involvement by Chief Maxwell in these decisions.  (*Id.*)  Next, between November 2018 and January 2019, Plaintiff and Chief Nichols met and exchanged correspondence regarding these matters.  (Doc. 71-3 at 19-23, 29; Doc. 77-2 at 215, 225, 227-28.)  That correspondence contains no mention of any involvement by Chief Maxwell.  (*Id.*)  Finally, the January 17, 2019 "Notice of Physical Re-Test" was from "Deputy Chief Dave Wilson on behalf of Fire Chief Mark Nichols."  (Doc. 77-2 at 219.)  Once again, there was no mention of any involvement by Chief Maxwell.  (*Id.*)  This lack of involvement is not surprising, as Chief Maxwell characterized himself during his deposition as "the budget guy" for the Fire District (*id.* at 179), not as someone who was responsible for overseeing the disciplinary aftermath of Plaintiff's failed tests.  Additionally, Plaintiff acknowledged during his deposition that Chief Maxwell made no attempt to "follow-up" with Plaintiff after unexpectedly making the "very bizarre" and "very unusual" comments at issue here (*id.* at 123).

During oral argument, Plaintiff's counsel stated that he is in possession of certain other evidence, which is not currently part of the record, that establishes Chief Maxwell's involvement in the decisionmaking process described above. Counsel acknowledged that the Court need not consider such outside-the-record evidence at summary judgment but offered to make it available if allowed to supplement the record. The Court appreciates this offer, and the candid way it was presented, but declines this invitation. *See* Fed. R. Civ. P. 56(e)(2). First, and most important, both sides had a full and fair opportunity to present all of the necessary evidence to support their positions during the summary judgment briefing process. This case is now well over two years old and the Court is unwilling to inject further delay into its resolution by reopening the summary judgment briefing process. (As discussed in later portions of this order, the Court has also declined Defendants' request to reopen the summary judgment record on another issue.) Second, at any rate, based on counsel's description of the outside-the-record evidence during oral argument, that evidence would not establish that Chief Maxwell was a *decisionmaker* with respect to the processes discussed above. Instead, it would at most show that Chief Maxwell was aware of the decisions being made by others.

Finally, even though (as noted above) the termination decision is not the relevant decisionmaking process in light of Plaintiff's now-clarified theory of disparate-treatment liability, Plaintiff's fleeting assertion that Chief Maxwell was "involved in the steps leading to Plaintiff's discharge" (Doc. 77 at 13) is unsupported by the record. Plaintiff's brief makes no effort to cite any evidence to support this assertion, which violates Rule 56(c)(1)(A)'s directive that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."[11]

---

[11]     During oral argument, Plaintiff's counsel asserted for the first time that two documents in the record—first, Chief Nichols's January 10, 2019 email to Plaintiff, on which Chief Maxwell was copied, that offered Plaintiff the choice to either retire on March 10, 2019 or take a one-year leave of absence (Doc. 77-2 at 215); and second, the NOI (*id.* at 216-17)—create a triable issue of fact as to Chief Maxwell's involvement in the termination decision. But this evidence does not demonstrate that Chief Maxwell was involved in the decisionmaking process concerning Plaintiff's termination. At most, it suggests that Chief Maxwell was award of Chief Nichols's decisions.

1    Additionally, the Court's independent review of the record suggests that Chief Nichols

2    made the initial determination to terminate Plaintiff (Doc. 71-3 at 43) and then the Fire

3    Board, of which Chief Maxwell was not a member, considered and rejected Plaintiff's

4    appeal (Doc. 71-4 at 2-4, 19-22, 26-28).

5                          ii.    Circumstantial Evidence

6         If a plaintiff uses circumstantial evidence to establish an age discrimination claim,

7    the "three-stage burden shifting framework" in *McDonnell Douglas* applies.  *Sheppard*,

8    694 F.3d at 1049 (quotation marks omitted).  "Under this framework, the employee must

9    first establish a prima facie case of age discrimination."  *Diaz v. Eagle Produce Ltd. P'ship*,

10   521 F.3d 1201, 1207 (9th Cir. 2008) (citations omitted).  "Generally, to establish a *prima*

11   *facie* case of an ADEA violation, the plaintiff must show he was: (1) a member of a

12   protected class [age 40–70]; (2) performing his job in a satisfactory manner;

13   (3) discharged; and (4) replaced by a substantially younger employee with equal or inferior

14   qualifications."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994), *as amended*

15   *on denial of reh'g* (July 14, 1994) (citation omitted).  However, this specification of the

16   elements presumes that the plaintiff is challenging a termination decision, and the ADEA

17   also permits a plaintiff to challenge other types of adverse employment actions.  *See*

18   *generally* 29 U.S.C. § 623(a) ("It shall be unlawful for an employer . . . to *discharge* any

19   individual *or otherwise discriminate* against any individual with respect to his

20   compensation, terms, conditions, or privileges of employment, because of such

21   individual's age.") (emphases added).  For example, the Ninth Circuit has clarified that an

22   ADEA plaintiff may pursue "a failure-to-promote case," in which event the third element

23   of the *prima facie* case is whether the plaintiff was "denied the position" and the fourth

24   element is whether "the promotion was given to a substantially younger person."  *Shelley*

25   *v. Green*, 666 F.3d 599, 608 (9th Cir. 2012).  *See also Bell v. VF Jeanswear LP*, 2016 WL

26   10644090, *1-2 (D. Ariz. 2016) ("While the third prong of *a prima facie* case in a discharge

27   claim requires the plaintiff to show he or she was discharged, the Court recognizes the third

28   prong changes in other employment cases based on the adverse employment action the

plaintiff alleges.").  As discussed, Plaintiff has now clarified that "this is not a termination and replacement case" and that the alleged adverse employment actions he seeks to challenge for purposes of his disparate-treatment claim are (1) limiting his number of opportunities to retake the Gerkin Protocol Test after initially failing the test; (2) not allowing him to perform certain tasks after being placed on a light-duty assignment in the aftermath of the failed test; and (3) being offered a relatively shorter "total combination of" paid light-duty work and unpaid leave in the aftermath of the failed test.

a.  **Satisfactory Performance**

Defendants concede that Plaintiff satisfies the first element of the prima facie test but dispute whether he can satisfy the second element of satisfactory performance. Although the issue presents a close call, the Court concludes in light of Plaintiff's "minimal" burden of proof in this context, *Opara*, 57 F.4th at 722, that Plaintiff's evidence as to the second element is sufficient.  Plaintiff provides his 2015 performance evaluation, in which he scored 5 out of 5 in most areas and a 4 out of 5 in others.  (Doc. 77-2 at 2-9.) Plaintiff also submits his medical examination results from June 2015, June 2016, and April 2017.  (*Id.* at 48-50.)  In June 2015, Plaintiff achieved a MET score of 10.7 yet was still found to "[m]eet[] the medical and physical requirements for modified duty," albeit with restrictions and conditions of "[p]rovisional release for 3 months [and] [r]ecommend[ed] exercise program to increase aerobic capacity."  (Doc. 71-2 at 56-57.)  In June 2016, Plaintiff "[met] the medical and physical requirements for full duty with no restrictions." (Doc. 77-2 at 49.)  In April 2017, Plaintiff "[met] the medical and physical requirements for full duty," but the doctor noted a concern with his "[d]eficient cardiorespiratory/aerobic fitness.  Currently 9.9 METs.  This is below [f]irefighter standards."  (*Id.* at 50.)  For the June 2016 and April 2017 examinations, the doctor could have concluded that Plaintiff "does not meet the medical and physical requirements for regular duty firefighting" but did not.  (*Id.* at 49-50.)  On this record, a reasonable factfinder could conclude that Plaintiff was able to (and did) satisfactorily perform the job of firefighter from 2015-17 despite his inability to achieve a MET score of at least 12.  Meanwhile, although the District chose

beginning in late 2017 to adopt the Health Center Policy, which required firefighters to achieve a minimum MET score of 12, it can be reasonably disputed on this record whether that new requirement was a permissible proxy for satisfactory performance, particularly where Plaintiff was able to perform satisfactorily during the three preceding calendar years despite not meeting this MET threshold and there is evidence that the District has since discontinued its reliance on the MET threshold.  (Doc. 77-2 at 75 [M.T. deposition: "[T]he MET standard . . . [is] currently no longer being used."].)

            b.      **Younger Comparator—Same Adverse Action**

        Defendants also dispute the fourth element of the prima facie test, which addresses whether a younger comparator was subjected to the same adverse actions.   Again, Plaintiff's now-refined theory as to this element is that he was treated "differently than a similarly situated and substantially younger firefighter" because the District (1) "permitted [M.T.] to take the treadmill test on six (6) occasions over 19 months"; (2) "continued to provide [M.T.] with paid light duty assignments that Plaintiff could have easily performed, such as paramedic and water truck duties"; and (3) afforded M.T. "a total combination of" paid light-duty work and unpaid leave that was "considerably longer than Plaintiff['s]." (Doc. 77 at 13.)   Meanwhile, Defendants contend that "the District treated [Plaintiff and M.T.] exactly the same.  Both . . . initially tested into Tier 4, both were removed from active duty, both were placed on leave and given time to train, both failed to achieve a satisfactory fitness score after training, and both were released from their firefighting services at the District due to their poor physical fitness conditions.  The only difference is that [M.T.] took a leave of absence from the District to try and improve his physical fitness, whereas [Plaintiff] rejected the District's offer that he also take a leave of absence."  (Doc. 78 at 4.)

            i.      <u>Opportunity To Retest</u>

        As for the first alleged form of differential treatment (opportunity to pass the treadmill test after the initial failed test), the relevant timeline is as follows.  In January 2018, Plaintiff failed the treadmill test for the first time, achieving a MET of 9.3.  (Doc. 71-3 at 7.)  In March 2018, Plaintiff made a failed practice attempt, achieving a MET of

9.01.  (Doc. 77-2 at 192-93; Doc. 71-4 at 38 ¶ 37.)  In May 2018, Plaintiff was scheduled to make another attempt but failed to do so.  (Doc. 77-2 at 223.)  Although the reasons why this May 2018 attempt did not occur are disputed, Plaintiff acknowledges in his declaration that District officials voluntarily agreed at that time that "it made sense to extend the time for [Plaintiff] to take the next test."  (*Id.* at 44 ¶ 6.)  In June 2018, Schell texted Plaintiff asking to set up a "treadmill test," but Plaintiff declined that offer.  (*Id.* at 209.)  In July 2018, Plaintiff was "offered 2 different days to meet for treadmill/stair master" but did not "attend[]."  (*Id.* at 200, capitalization omitted.)  In August 2018, Plaintiff was offered yet another chance to retake the test, and he contends he failed at that time.  (Doc. 71-4 at 10.)  In September 2018, Plaintiff made another failed attempt to pass the treadmill test, achieving a MET score of 10.5.  (Doc. 71-3 at 7.)  Plaintiff's next scheduled retest was in November 2018, but he emailed Chief Nichols about two weeks beforehand to state that he would not be participating.  (Doc. 77-2 at 225.)  Plaintiff's next scheduled retest was in January 2019, but he emailed Chief Nichols a few days beforehand to state that he would not be participating.  (*Id.* at 220.)  Finally, in December 2019, the Fire Board offered to reinstate Plaintiff and provide him with yet another opportunity to retake the test eight weeks later (*i.e.*, in February 2020), but Plaintiff rejected that offer.  (Doc. 71-4 at 21; *id.* at 44 ¶¶ 91-92.)

As this chronology shows, between March 2018 and February 2020 (a span of 23 months), Plaintiff by his own account failed two or three retests (March 2018 practice test, August 2018 official test, September 2018 official test), was offered but declined the opportunity to participate in three other official retests (November 2018, January 2019, February 2020), and was also offered but declined other opportunities to participate in retests (June 2018, July 2018).  Thus, even accepting Plaintiff's assertion that M.T. was "permitted . . . to take the treadmill test on six (6) occasions over 19 months" (Doc. 77 at 13), no reasonable juror could conclude on this record that Plaintiff was offered fewer opportunities than M.T. to obtain compliance.

During oral argument, Plaintiff asserted that the preceding analysis is flawed

because the only relevant testing opportunity is an *official* retest, not an unofficial retest or an opportunity to practice the test with the personal trainer, and also because the Court should not consider the additional retesting opportunity offered to him in December 2019 (because it came after his termination).   In the Court's view, these are artificial distinctions—because Plaintiff's liability theory is that "Defendants treated a similarly situated substantially younger firefighter much better" by permitting that younger firefighter "to take the treadmill test on six (6) occasions over 19 months," it follows that all of Defendants' efforts to offer retesting opportunities to Plaintiff should be considered.

Nevertheless, even assuming that Plaintiff is correct, such that Plaintiff has satisfied his prima facie case as to this liability theory, the burden would simply shift to Defendants to articulate legitimate, non-discriminatory reasons for any difference in the retesting opportunities that were offered to M.T. and Plaintiff.  Defendants have met that burden here.  First, Defendants note that any difference is explained by the fact that Plaintiff repeatedly refused Defendants' offers to retake the test, whereas there is no evidence that M.T. refused any such offers.  Second, by Plaintiff's own account, Plaintiff was too injured for much of 2018 and 2019 to pass the test.  For example, in June 2018, Plaintiff declined Schell's offer to set up a "treadmill test" because Plaintiff believed he was "not clear to run yet." (Doc. 77-2 at 209.)  A few months later, in November 2018, Plaintiff emailed Chief Nichols to contend that "I am still injured and have not been able to prepare for my next Treadmill Test that the department has scheduled on November 20th, 2018." (*Id.* at 225.) And again, in January 2019, Plaintiff informed Chief Nichols that he was "not going to make the Treadmill Test you scheduled on Thursday" in part because "I do not believe that I am cleared by my doctor for that." (*Id.* at 220.)  This provides another legitimate, non-discriminatory explanation for any difference in the number of test-taking opportunities— it would have been futile to offer more opportunities to Plaintiff given his professed inability to pass the test.

Because Defendants met their burden, the burden shifts back to Plaintiff to present evidence that Defendants' proffered reasons are pretextual.  Plaintiff has failed to meet that

burden.  Although Plaintiff asserts in conclusory fashion in the introductory paragraph of his brief that he has "illustrat[ed] the false and pretextual nature of Defendants' purported reasons for their actions" (Doc. 77 at 1), Plaintiff's only fleeting argument on this point in the body of his brief is that "[a] triable issue of pretext is . . . shown through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff." (*Id.* at 13, cleaned up.)  However, there is no evidence in the record that M.T. was offered and then turned down even more retesting opportunities and/or that M.T. refused even more retesting opportunities based on claims of injury.  In a related vein, to the extent Plaintiff's counsel suggested during oral argument that Defendants should have offered him the opportunity to take an alternative test (such as a walking test), there is no evidence that M.T. was offered the opportunity to take an alternative test.

### ii.   Different Tasks

The next alleged form of differential treatment is that M.T. was "provide[d] . . . with paid light duty assignments that Plaintiff could have easily performed, such as paramedic and water truck duties." (Doc. 77 at 13.)  This appears to be a complaint that Plaintiff was required to perform different tasks than M.T. after each was transferred from an active-duty assignment to the "40-hour assignment," *i.e.*, paid light-duty work.

To qualify as an adverse employment action, a challenged practice must "materially affect[] the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (cleaned up).  The quintessential example of a cognizable adverse action is "where an employer's action negatively affects its employee's compensation." *Fonseca v. Sysco Good Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004).  However, Plaintiff does not contend (at least as it relates to his second theory) that he received less pay than M.T. during their respective reassignments to paid light-duty work.  Instead, Plaintiff simply contends that his assigned tasks during this period were different from (and, presumably, less desirable than) the tasks assigned to M.T.

It is true that "assigning more, or more burdensome, work responsibilities, is an

adverse employment action," including assigning "a disproportionate amount of dangerous and strenuous work." *Davis*, 520 F.3d at 1089-90. *See generally Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Nevertheless, the problem with Plaintiff's showing on this issue is that he makes no effort to identify the tasks he was required to perform during his period of light-duty reassignment,[12] let alone to establish that those unspecified tasks were more burdensome, strenuous, or dangerous than the tasks assigned to M.T.

> iii.   Duration Of Paid Light-Duty Work and Unpaid Leave

The final alleged form of differential treatment is that M.T. was afforded "a total combination of" paid light-duty work and unpaid leave that was "considerably longer than Plaintiff['s]." (Doc. 77 at 13.) An initial difficulty in evaluating this claim is that the record is underdeveloped as it pertains to M.T. Defendants do not appear to have attached any materials related to M.T. to their motion and Plaintiff only attaches a smattering of

---

[12]   The first passage in Plaintiff's brief touching on this issue simply provides: "Defendants removed Plaintiff from active duty and placed him on light duty immediately after failing the treadmill test." (Doc. 77 at 4.) The next relevant passage provides: "The District permitted [M.T.] to continue to be paid to work on the District's civilian ambulance, and then water tank crew, despite not passing the test on numerous occasions . . . . Plaintiff could have easily performed these same jobs, but the District refused. Furthermore, Plaintiff could have continued to work on the District projects he was already assigned or provide training or work for the Community Emergency Response Team." (*Id.* at 8-9.) Although this passage is more detailed than the previous one, it still does not identify the tasks that Plaintiff performed during his light-duty reassignment. Nor does the exhibit that is cited to support this passage. (Doc. 77-2 at 44 ¶ 8.) The next relevant passage provides: "[The District] continued to provide [M.T.] with paid light duty assignments that Plaintiff could have easily performed, such as paramedic and water truck duties . . . ." (Doc. 77 at 13.) As with the other passages, there is no discussion of Plaintiff's actual tasks and duties. Finally, the last relevant passage asserts, without citation to the record, that Plaintiff performed unspecified "administrative jobs" during his light-duty reassignment. (*Id.* at 16.) Perhaps there is an exhibit buried somewhere in the record that sheds more light on Plaintiff's specific responsibilities during his period of light-duty assignment and shows that those responsibilities differed from M.T.'s in a material way, but "[t]he court need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). *See generally Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (cleaned up).

M.T.-related materials to his response brief—specifically, a brief reference to M.T. in one paragraph of Plaintiff's declaration (Doc. 77-2 at 44 ¶ 8), eight pages from M.T.'s deposition transcript (*id.* at 73-80), and a one-page document entitled "[M.T's] Fitness Policy Summary Events" (*id.* at 83).  At any rate, these materials, construed in the light most favorable to Plaintiff, suggest that in December 2018, M.T. failed the treadmill test and was placed on a 40-hour schedule, which was tantamount to "paid light duty" (*id.* at 77, 83);[13] that in September 2019, after additional failed tests, M.T. was placed on a "Last Chance Agreement" (*id.* at 74); that M.T. was not allowed to remain on a paid light-duty assignment after being placed on the Last Chance Agreement and instead "had to use up whatever remaining vacation [he] had" (*id.* at 75);[14] that in June 2020, M.T. failed two more treadmill tests (*id.* at 83); and that in July 2020, M.T. was terminated (*id.* at 77).  In other words, Plaintiff's proffered materials can be construed as establishing that (1) M.T. was reassigned to a paid light-duty schedule for 9 months following his initial failed treadmill test (*i.e.*, December 2018 to September 2019); and (2) M.T. was then placed on unpaid leave, during which time he was allowed to use his accrued vacation leave, for an additional 10 months (*i.e.*, September 2019 until July 2020) before being terminated.

Turning to Plaintiff, the relevant chronology is that on February 6, 2018, following a failed treadmill test, Plaintiff was placed on a paid light-duty assignment (Doc. 71-2 at 65); that on May 7, 2018, Plaintiff's paid light-duty assignment was extended for another 90 days (Doc. 77-2 at 223); that on September 4, 2018, Plaintiff was placed on a "Last Chance Agreement" (Doc. 71-3 at 4-5); that on September 6, 2018, following another

---

[13]     Although the first bullet point in the summary document states that M.T. was "Placed [on] 40-Hour schedule" in December 2018, the next bullet point indicates that M.T. did not "[s]ign[] 40-Hour agreement" until February 2019.  (Doc. 77-2 at 83.)  Additionally, during his deposition, M.T. suggested at one point that his paid light-duty assignment did not begin until about six months after his first failed test—that is, until May 2019.  (*Id.* at 77.)  For present purposes, the Court will utilize the earliest date of December 2018 because it is most favorable to Plaintiff's liability theory.

[14]     During oral argument, Plaintiff's counsel stated that there is additional evidence, which is not part of the current record, that shows M.T. was allowed to revert back to a paid light-duty assignment at some point after being placed on the "Last Chance Agreement."  The Court declines to reopen the record to consider this new evidence for the same reason it has rejected both sides' requests to reopen the record to submit new evidence concerning other issues.

failed treadmill test, Plaintiff was placed on unpaid leave, but with the option of using accrued vacation/sick leave (*id.* at 5 ["If on Thursday September 6, 2018 the results of your reevaluation show a MET's score of less than 11 you will be suspended without pay . . . [but] may choose to use your sick/vacation accruals during this time."]); that in January 2019, Plaintiff was offered but rejected the opportunity to take a one-year leave of absence (Doc. 77-2 at 215, 227-28); that on February 21, 2019, Plaintiff received a "Memo of Termination" (*id.* at 230); that on December 16, 2019, Plaintiff was offered the opportunity to be reinstated onto a paid light-duty schedule, with the expectation that he would retake the treadmill test eight weeks later (Doc. 71-4 at 21); and that on December 20, 2019, Plaintiff rejected the reinstatement offer (*id.* at 24).  In other words, the record establishes that (1) Plaintiff was reassigned to a paid light-duty schedule for 7 months following his initial failed treadmill test (*i.e.,* February 6, 2018 to September 6, 2018); and (2) Plaintiff was then placed on unpaid leave, during which time he was allowed to use accrued vacation and sick leave, for an additional 5.5 months (*i.e.*, September 6, 2018 until February 21, 2019) before being terminated.

The juxtaposition of M.T. and Plaintiff is enough to satisfy Plaintiff's minimal burden of proof under the fourth element of the prima facie test.  M.T. remained on a paid light-duty assignment for 2 more months than Plaintiff (*i.e.*, 9 months versus 7 months) after their respective failed initial treadmill tests and was then allowed to remain on unpaid leave, with the option of using accrued vacation time, for 4.5 more months than Plaintiff (*i.e.*, 10 months versus 5.5 months) after the expiration of their respective paid light-duty assignments.  These differences could qualify as adverse employment actions because they had the potential to "negatively affect[]" Plaintiff's "compensation."  *Fonseca*, 374 F.3d at 847.

Because Plaintiff has established a prima facie case of age discrimination, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action."  *Diaz*, 521 F.3d at 1207 (citation omitted).  Defendants have met that burden here.  As discussed, Plaintiff's liability theory turns in part on the relative

duration of the paid light-duty assignments that M.T. (9 months) and Plaintiff (7 months) performed after their initial failed tests. Defendants have articulated a legitimate, non-discriminatory reason for that difference—Plaintiff's rejection of the offer to reinstate him in December 2019 and place him on a paid light-duty assignment for an additional eight weeks. This additional eight-week period would have resulted in Plaintiff receiving just as much aggregate paid light-duty work as M.T.

The other component of Plaintiff's liability theory turns on the relative duration of the terms of unpaid leave offered to M.T. (10 months) and Plaintiff (5.5 months) after the expiration of their respective terms of paid light-duty work. Once again, Defendants have articulated a legitimate, non-discriminatory reason for that difference—Plaintiff's rejection of the District's offer to take an additional one-year leave of absence to train for the treadmill test. (Doc. 78 at 4.) The addition of that one-year term would have resulted in Plaintiff receiving more aggregate unpaid leave than M.T.

Because Defendants have met their burden, "the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination." *Diaz*, 521 F.3d at 1207 (citation omitted). Plaintiff has failed to meet that burden here. As noted above, Plaintiff's only fleeting argument on this issue is that "[a] triable issue of pretext is . . . shown through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff." (Doc. 77 at 13, cleaned up.) Plaintiff's reliance on this principle is misplaced because he has not come forward with comparative evidence that younger employees were treated more favorably—as discussed, his sole proffered comparator is M.T., Defendants have articulated legitimate, non-discriminatory reasons for the relative differences in the duration of their paid light-duty assignments and terms of unpaid leave, and Plaintiff has made no effort whatsoever to establish that those reasons are pretextual.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's now-clarified ADEA disparate treatment claim.

…

2.   <u>Disparate Impact</u>

a.   **The Parties' Arguments**

Defendants argue that Plaintiff "cannot establish a prima facie case of disparate impact discrimination under the ADEA" because he "has not come forward with any statistical evidence to support his allegation that the Health Center Policy had an adverse impact upon firefighters who are over 40 years old." (Doc. 71 at 9-10, capitalization omitted.)

Plaintiff responds that "Defendants' policy on its face provides Plaintiff with enough to satisfy a disparate impact claim under the ADEA" because "the minimum METs score under the new policy is the same regardless of age" and "the fitness test completely disregards job performance." (Doc. 77 at 13-14.)

In reply, Defendants elaborate upon some of the arguments raised in their motion. (Doc. 78 at 6.) Defendants also argue that setting the MET threshold at 12 regardless of age "was necessary because 'research with firefighters indicates that a minimum capacity of 12.0 METs is needed for safe fire ground operations.'" (*Id.* at 7, cleaned up.)

b.   **Analysis**

"To state a prima facie case under a disparate impact theory, a plaintiff must demonstrate (1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular age produced by the employer's facially neutral acts or practices." *Katz v. Regents of the Univ. of California*, 229 F.3d 831, 835 (9th Cir. 2000) (cleaned up). A plaintiff "need not prove motive or intent, but the company can defend by establishing that the challenged practice was based on legitimate business reasons, such as job-relatedness or business necessity. At that point, the employee would have to show that other [employment] practices could serve the same business interest identified by the company without having a discriminatory effect." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291 (9th Cir. 2000) (citation omitted).

As for the first factor, "[a] disparate impact claim must challenge a specific business

practice." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003). Defendants do not dispute that requiring a minimum MET score on the Gerkin Protocol Test is a specific business practice. *Arizona v. City of Cottonwood*, 2012 WL 2976162, *5 (D. Ariz. 2012) ("[N]o party disputes that Plaintiff has identified the specific practice of using the fitness standards set fort[h] in the FIT test as a requirement for promotion to sergeant.").

Plaintiff's disparate impact theory fails, however, because he has presented no evidence that requiring a minimum MET score on the Gerkin Protocol Test had "a significantly adverse or disproportionate impact on" firefighters over 40 years old. Plaintiff fails to offer a single example, other than himself, of firefighters over the age of 40 who failed to achieve the minimum required score. Plaintiff has thus failed to come forward with the sort of statistical proof necessary to pursue this type of claim. *See, e.g., Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014) ("In whatever procedural guise a disparate impact claim appears, the party asserting it must demonstrate a statistical disparity affecting members of the protected group. Absent such a group-based disparity, the claim fails . . . ."). Additionally, although the absence of statistical evidence is alone dispositive, Defendants have come forward with evidence that firefighters over 40 can and do pass the test. (Doc. 71-4 at 70-71 [list of 13 individuals, aged 50 to 67, who passed the Gerkin Protocol Test with a MET score of 12 or higher].) No reasonable juror could conclude on this record that the challenged practice had a significant adverse or disproportionate impact on firefighters over 40 years old.

B.   **Retaliation**

1.   The Parties' Arguments

Defendants argue that Plaintiff "cannot establish a prima facie retaliation claim under the ADEA." (Doc. 71 at 11, capitalization omitted.) Relying on *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793 (9th Cir. 1982), Defendants contend that Plaintiff cannot establish a causal link between the sole instance of protected activity he has identified (his November 30, 2018 email to Chief Nichols) and his termination because "[t]he District's decision to terminate [Plaintiff's] employment was . . . a natural continuation of the

disciplinary process that had already begun before November 30, 2018, not evidence of retaliation. . . .  No evidence suggests his age was a 'but for' factor."  (Doc. 71 at 11-12.)

Plaintiff responds that he engaged in protected activity before November 30, 2018. (Doc. 77 at 14.)  Plaintiff also argues that Chief Nichols admitted that Plaintiff's complaints affected his decision to initiate the NOI, which led to the termination process.  (*Id.*) Plaintiff argues that retaliatory intent can be inferred because "[h]ere, less than two (2) months after Chief Nichols threatened an investigation because of Plaintiff's good faith concerns of discrimination, he fired him."  (*Id.* at 14-15.)  Plaintiff adds that "age and/or [P]laintiff's complaints about age discrimination need not be the sole or primary cause of the employer's adverse action to satisfy the 'but-for' standard."  (*Id.* at 15.)

In reply, Defendants elaborate upon the arguments raised in their motion.  (Doc. 78 at 8.)  Defendants also argue that "[e]ven if the Court considers the Facebook posts referenced in [Plaintiff's] deposition testimony as part of his Response, the Facebook posts do not establish any retaliation . . . regarding the Health Center Policy because the posts accuse the District's management of being corrupt and abusive.  The posts do not discuss the Health Center Policy . . . [and] the District had already begun the disciplinary process against [Plaintiff] before learning about these complaints."  (*Id.* at 8-9.)

2.    Analysis

"To establish a claim of retaliation, a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action."  *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007).  "Once the plaintiff has established a prima facie case, the burden of production devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the adverse action.  The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff.  If the defendant meets this burden, the plaintiff must then show that the asserted reason was a pretext for retaliation.  The ultimate burden of persuading the court that the defendant

1    unlawfully retaliated against her remains at all times with the plaintiff."  *Cohen*, 686 F.2d

2    at 796-97 (Title VII case) (citations omitted).  *See also Merrick v. Farmers Ins. Grp.*, 892

3    F.2d 1434, 1441 (9th Cir. 1990) ("Those circuits that have considered ADEA retaliation

4    claims have generally adopted the analysis used in Title VII cases without comment.").

5                            a.    **Protected Activity**

6          Although Plaintiff has not been consistent throughout this litigation as to the theory

7    of liability underlying his ADEA retaliation claim,[15] a reasonable juror could conclude that

8    Plaintiff engaged in protected activity under the ADEA on at least three discrete instances

9    in 2018 and 2019 by raising concerns that the Health Center Policy was discriminatory

10   toward older firefighters.

11         First, a reasonable juror could conclude that Plaintiff engaged in protected activity

12   when he wrote the November 30, 2018 email to Chief Nichols raising various concerns

13   about his suspension.  (Doc. 71-3 at 19-20.)  Indeed, Defendants do not dispute that the

14   November 30, 2018 email may qualify as protected activity—they only contend (as

15   discussed in more detail below) that Plaintiff cannot establish the requisite causal link

16   based on that email.

17         Second, a reasonable juror could conclude that Plaintiff engaged in protected

18   activity when he engaged in a follow-up conversation with Chief Nichols after sending the

19   ─────────────
     [15]     Defendants argue that Plaintiff should only be allowed to rely on his November 30,
20   2018 email to Chief Nichols for purposes of the protected-activity inquiry because "during
     discovery . . . when Defendants asked [Plaintiff] to identify the complaints he made about
21   the Health Center Policy, he identified his November 30, 2018 e-mail, not any other earlier
     or later complaints." (Doc. 78 at 8.)  This argument is unavailing.  Even though Plaintiff's
22   interrogatory response did not identify all of the alleged instances of protected activity now
     identified in his response brief, the general rule is that "answers to interrogatories . . . are
23   not binding judicial admissions."  1 Gensler, Federal Rules of Civil Procedure, Rules and
     Commentary, Rule 33 (2022).  *See generally Moore v. Computer Associates Int'l, Inc.*, 653
24   F. Supp. 2d 955, 962 n.4 (D. Ariz. 2009) ("Defendant also argues three of the proposed
     accommodations . . . should not be considered because Plaintiff failed to raise them when
25   responding to a set of contention interrogatories propounded during discovery.  This
     argument misapprehends the purpose of an interrogatory.   Although contention
26   interrogatories are useful in narrowing and sharpening the issues, the general rule in the
     Ninth Circuit is that a party's answers to an interrogatory do not limit the party's ability to
27   make an argument in future proceedings.  Without a specific argument why Plaintiff's
     initial and supplemental answers to the contention interrogatories were so incomplete as to
28   prejudice Defendant and warrant an exception to the rule, Defendant's argument will be
     rejected and Plaintiff will not be so limited.") (cleaned up).

November 30, 2018 email in which he "elaborate[d]" on that email and "explained that the physical fitness policy discriminates against older employees because employees over 50, such as himself, are expected to maintain the same minimum METs score as employees in their 20s." (*Id.* at 23-24.)

Third, a reasonable juror could conclude that Plaintiff engaged in protected activity when he wrote the January 15, 2019 email to Chief Nichols, which cross-referenced the concerns raised in Plaintiff's November 30, 2018 email. (Doc. 77-2 at 227-28.) *See also Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) ("Making an informal complaint to a supervisor is . . . a protected activity.").

In the tentative ruling issued before oral argument, the Court stated that Plaintiff may have also engaged in protected activity when he made certain posts on Facebook. (Doc. 83 at 42-43.)   The tentative ruling acknowledged that the record was severely underdeveloped as to the content and timing of these Facebook posts, and during oral argument Defendants' counsel asked for leave to supplement the record with more information about the Facebook posts (because, in Defendants' counsel's view, the additional evidence would show that the Facebook posts did not raise concerns about the discriminatory nature of the Health Center Policy and thus cannot qualify as protected activity for ADEA purposes).[16]  Although the Court appreciates this offer, it concludes that supplementation is unnecessary here.  As discussed below, even if the Facebook posts are excluded from the analysis, Plaintiff has still proffered sufficient evidence to survive summary judgment on his ADEA retaliation claim.  Accordingly, any dispute over the relevance of the Facebook posts is best addressed through motions *in limine*, not through reopening (and delaying) the summary judgment process.

---

[16]     *See, e.g., Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) (explaining that although "[a]n employee need not establish that the opposed conduct in fact [constituted unlawful discrimination] in order to establish a valid claim of retaliation . . . the opposed conduct must fairly fall within the protection of [the anti-discrimination statute] to sustain a claim of unlawful retaliation"); *Kurdi v. Cal. Dep't of Trans.*, 2023 WL 267538, *6 (E.D. Cal. 2023) ("[I]f an employee does not sufficiently allege that she opposed discrimination based upon race, color, religion, sex, or national origin, she cannot claim that she engaged in a protected activity.").

<div align="center">1</div>

b.   **Adverse Employment Action**

Plaintiff's brief is not a model of clarity as to which adverse actions give rise to his ADEA retaliation claim.  As discussed at length in Part II.A of this order, Plaintiff has now clarified that, at least for purposes of his disparate-treatment claim under the ADEA, "[t]his is not a termination and replacement case; rather, the District treated Plaintiff differently than a similarly situated and substantially younger firefighter *while Plaintiff was still employed*" with respect to (1) the number of opportunities to retake the treadmill test, (2) the type of work performed while reassigned to paid light-duty work, and (3) the overall amount of time spent on paid light-duty work and unpaid leave before termination.  (Doc. 77 at 12-13.)  However, Plaintiff does not repeat these assertions in the portion of his brief discussing his ADEA retaliation claim.  (*Id.* at 14-15.)  Instead, in that portion of the brief, Plaintiff argues that he was subjected to unlawful retaliation because (1) Chief Nichols's "threat to investigate Plaintiff . . . was 'definitely' based on Plaintiff's good faith concerns that the policy discriminated against older employees"; and (2) the "decision to discharge Plaintiff" was motivated by the same concerns.  (*Id.* at 14.)

Under Ninth Circuit law, "[a]n adverse employment action is any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity."  *Poland*, 494 F.3d at 1180 (cleaned up).  A reasonable juror could conclude that both of the challenged actions at issue here satisfy that standard.  *See, e.g., Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1022 (9th Cir. 2018) ("We have previously indicated that merely investigating an employee—regardless of the outcome of that investigation—likely can support a claim for Title VII retaliation."); *Freitag v. Ayers*, 468 F.3d 528, 542-43 nn.7-8 (9th Cir. 2006) (identifying "the decision . . . to initiate the internal affairs investigation" as an action that "would be considered materially adverse by a reasonable employee"); *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002) ("Dr. Ulrich was subjected to more than trivial adverse employment actions.  The hospital subjected him to an investigation that threatened to revoke his clinical privileges.  It subsequently refused to rescind his resignation and filed

<div align="center">- 44 -</div>

1    an adverse action report against him, marring his employment record.  Although these

2    decisions by the hospital could have been taken for a number of reasons, if they were in

3    retaliation for his protected speech activity then the First Amendment was violated.”).

4                    c.    **Causal Link**

5            “At the prima facie stage of a retaliation case, the causal link element is construed

6    broadly so that a plaintiff merely has to prove that the protected activity and the negative

7    employment action are not completely unrelated.”  *Poland*, 494 F.3d at 1180 n.2 (cleaned

8    up).  “Essential to a causal link is evidence that the employer was aware that the plaintiff

9    had engaged in the protected activity.”  *Cohen*, 686 F.2d at 796.

10           A reasonable juror could conclude that there is a causal link between Plaintiff’s

11   protected activity and both of the adverse actions at issue here (*i.e.*, issuing the NOI on

12   January 10, 2019 and then terminating Plaintiff on February 21, 2019).  Although plaintiffs

13   pursuing retaliation claims often attempt to establish causation inferentially, by relying on

14   the “proximity in time between the protected action and the” challenged adverse action,

15   “[a]lternatively, the plaintiff can prove causation by providing direct evidence of retaliatory

16   motivation.”  *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).  Here,

17   Plaintiff has come forward with direct evidence of retaliatory motivation.  The NOI

18   specifically identifies Plaintiff’s use of his “position as a Fire Captain with Daisy Mountain

19   Fire District to attempt to sway the membership and public to side with your violation of

20   our policy on physical fitness” as one of the reasons why Plaintiff was being placed under

21   investigation.  (Doc. 77-2 at 216.)  Additionally, when asked during his deposition to

22   explain why Plaintiff had been placed under investigation, Chief Nichols testified, *inter*

23   *alia*, that he wasn’t “happy” with Plaintiff’s comments “about the fitness [policy] being

24   age discriminatory.”  (*Id.* at 22-23.)  Meanwhile, the “Memo of Termination” does not state

25   that Plaintiff was being terminated solely based on his failure to comply with the Health

26   Center Policy and remain “physical fit”—instead, it states that Plaintiff was also being

27   terminated for other violations, including not conducting himself in a manner that

28   “reflect[ed] . . . positively on the District on and off duty,” not performing his managerial

- 45 -

1    and supervisory duties "in an effective, considerate manner," and being "insubordinate."

2    (*Id.* at 230.)   A reasonable juror could conclude that these were references to Plaintiff's

3    complaints about the discriminatory effect of the Health Center Policy—conduct that, as

4    noted above, qualifies as protected activity.   Indeed, Chief Nichols stated during his

5    deposition that the "violations" referenced in the NOI formed "part" of the reason why

6    Plaintiff was fired.  (*Id.* at 27-28.)

7         *Cohen* does not compel a different conclusion.   Under *Cohen*, if the relevant

8    decisionmaker "did not know that [the plaintiff] had engaged in a protected activity" at the

9    time of "the decision that directly resulted in the adverse action," this "breaks the requisite

10   causal link."  686 F.2d at 797.  Defendants contend that Chief Nichols was unaware of any

11   of Plaintiff's protected activity at the time he decided to place Plaintiff on the "Last Chance

12   Agreement," which was executed on September 4, 2018.  (Doc. 71-3 at 4-5.)  But even

13   assuming this timeline is correct, Plaintiff's theory of liability is not that his placement on

14   the "Last Chance Agreement" was the retaliatory adverse action.   As noted, Plaintiff's

15   theory is that the two retaliatory adverse actions were the January 2019 issuance of the NOI

16   and the February 2019 termination decision.   Both of those actions occurred after Chief

17   Nichols became aware of Plaintiff's protected activity.   Additionally, although Defendants

18   contend that "[t]he District's decision to terminate [Plaintiff's] employment was . . . a

19   natural continuation of the disciplinary process that had already begun before November

20   30, 2018" (Doc. 71 at 11)—which seems to be an argument that Plaintiff's inability to

21   achieve a passing score on the treadmill test, which was the catalyst for the "Last Chance

22   Agreement," was also the catalyst for the NOI and the termination decision—this argument

23   overlooks that "[o]ften, events have multiple but-for causes" and thus "the traditional but-

24   for causation standard means a defendant cannot avoid liability just by citing some *other*

25   factor that contributed to its challenged employment decision.   So long as the plaintiff's

26   [protected activity] was one but-for cause of that decision, that is enough to trigger the

27   law."  *Bostock v. Clayton Cty., Ga.*, 590 U.S. 644, 656 (2020).[17]  Here, the NOI and the

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [17]    Although *Bostock* addressed the requirements for proving but-for causation in a
     Title VII discrimination case, those requirements are equally applicable in the ADEA

"Memo of Termination" each expressly identify Plaintiff's protected activity as one of the reasons for those adverse actions, and Chief Nichols testified to the same effect during his deposition.

### d.    **Non-Retaliatory Reason And Pretext**

To the extent Defendants' arguments about *Cohen* are not intended solely to challenge Plaintiff's showing as to his prima facie case, but are also intended to meet Defendants' step-two burden of articulating the existence of a legitimate, non-discriminatory reason for the challenged employment actions, those arguments are insufficient to avoid summary judgment. Defendants' position is that the District was entitled to place Plaintiff under investigation, and then terminate him, based solely on his failure to comply with the Health Center Policy: "The District is permitted to draw the line somewhere. It drew the line at [Plaintiff's] failure to obtain a satisfactory METs score and his refusal to continue to train and take a retest." (Doc. 71 at 12, cleaned up.) The burden thus shifts to Plaintiff to show that this "articulated reason is pretextual." *Opara*, 57 F.4th at 723.

"A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence. Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption. . . . Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination . . . [such as] showing that the employer's proffered explanation for the adverse action is unworthy of credence." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1094-95 (9th Cir. 2005) (cleaned up). "The distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment. Because direct evidence is so probative, the plaintiff need offer very little direct evidence to raise a genuine issue of material fact. But when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat the employer's motion

retaliation context. *Stilwell v. City of Williams*, 831 F.3d 1234, 1246-47 (9th Cir. 2016).

for summary judgment." *Id.* at 1095 (cleaned up).  Here, Plaintiff has come forward with direct evidence of pretext—as discussed, the NOI and the "Memo of Termination" each expressly state that Plaintiff's protected activity formed part of the basis for the adverse action.  Chief Nichols's deposition testimony can be reasonably construed as making the same point.  This is sufficient to satisfy the minimal burden of proof that applies under these circumstances.  *Cf. Maese-Thomason v. Embry-Riddle Aeronautical Univ.*, 2023 WL 5822513, *24 (D. Ariz. 2023) (denying defendant's summary judgment motion on Title VII retaliation claim because, "[m]ost important, this is an unusual case in that Plaintiff has proffered direct (rather than circumstantial) evidence that the [explanation for the adverse action] is pretextual—she contends that [her supervisor] admitted to her, during the performance-review meeting that preceded the PIP, that his 'biggest concern' was the fact that she had made complaints to HR without talking to him first," which "directly suggests that the true motivation for the PIP was dissatisfaction with Plaintiff's protected activity of complaining about sex-based discrimination to HR").

III.  <u>ADA Claim</u>

In Count Two, Plaintiff asserts a claim for disability discrimination in violation of the ADA.  "To state a prima facie case under the ADA, [a plaintiff] must show (1) that [he] is disabled within the meaning of the ADA; (2) that [he] is a qualified individual with a disability; and (3) that [he] was discriminated against because of [his] disability." *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).

A.  **Disabled Within The Meaning Of The ADA**

1.  <u>The Parties' Arguments</u>

Defendants argue that Plaintiff cannot establish that he was disabled under the ADA. (Doc. 71 at 12-13.)  More specifically, Defendants argue: "[Plaintiff] alleges that an injury to his Achilles prevented him from running.  Running is not a major life activity that qualifies as a 'disability' under the ADA.  Importantly, [Plaintiff] does not allege his Achilles injury prevented him from walking; in fact, [Plaintiff] alleges in this case that he wanted to take a walking test as part of his physical fitness test.  If [Plaintiff's] Achilles

injury did not prevent him from walking, it again does not qualify as a 'disability.'" (*Id.* at 13.)  Defendants add that "Dr. Leonetti . . . concluded [Plaintiff] was capable of retaking the physical fitness test on a treadmill after eight weeks of using heel lifts orthotics, anti-inflammatory medication, and stretching exercises." (*Id.*)

Plaintiff responds that his "Achilles tendonosis/tendonitis certainly during the time at issue here substantially limited his ability to walk, stand, climb stairs and other daily activities, such as dressing and bathing." (Doc. 77 at 15.)  Plaintiff also accuses Defendants of citing "case law prior to the change in the ADA in 2009, which included the expansion of what constitutes a disability." (*Id.*)

In reply, Defendants do not directly dispute any of these arguments.  Additionally, Defendants seem to acknowledge that Plaintiff *was* limited in his ability to walk.  Among other things, Defendants emphasize that Plaintiff "admits that his ability to walk . . . was 'substantially limited'" and argue that Plaintiff's inability to "walk, stand, and climb stairs" precludes him from establishing the second element of his ADA claim.  (Doc. 78 at 9.)

### 2.   <u>Analysis</u>

Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."   42 U.S.C. § 12102(1).  This definition "shall be construed in favor of broad coverage of individuals." *Id.* § 12102(4)(A).  "[A] person need fit only one of the three definitions to be disabled for the purposes of the ADA."  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1153 (9th Cir. 1997).  Plaintiff argues the first and third definitions are satisfied here.  (Doc. 1 ¶ 33.)

### a.   **Impairment Substantially Limiting Major Life Activities**

Evaluating disability under the first definition requires a three-step inquiry: (1) whether the plaintiff had a physical or mental impairment; (2) whether the affected activities are major life activities; and (3) whether the impairment substantially limited those activities.  *Gribben v. United Parcel Serv., Inc.*, 528 F.3d 1166, 1169 (9th Cir. 2008).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing

manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The sole ground on which Defendants moved for summary judgment as to the first element of Plaintiff's ADA claim was that his Achilles injury only prevented him from running, which is not a major life activity.  (Doc. 71 at 13.)  In the course of making that argument, Defendants seemed to acknowledge that if Plaintiff's injury also interfered with his ability to walk, it could qualify as a disability.  (*Id.*)  Plaintiff, in turn, came forward with evidence that his Achilles injury did interfere with his ability to walk, and Defendants did not dispute that evidence in their reply—instead, they pivoted to an argument as to why Plaintiff's inability to walk should be viewed as precluding him from satisfying the second element of his ADA claim.  (Doc. 78 at 9 ["Common sense dictates that [Plaintiff] could not perform the essential functions of his position because a firefighter must be able to walk . . . ."].)

On this record, Defendants are not entitled to summary judgment with respect to the first element of Plaintiff's ADA claim.  Defendants' sole argument as to that element— that Plaintiff did not experience any walking-related restrictions—is factually controverted and Defendants' motion did not require Plaintiff to come forward with any other evidence regarding the first element of his ADA claim.  *See, e.g., Costello v. Grunden*, 651 F.3d 614, 635 (7th Cir. 2011) ("The nonmovant is not required to present evidence on an issue not raised by the movant.").  *See generally* 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56 (2022) ("The nonmoving party's burden [at summary judgment] is defined by the issues raised in the motion.  Any issues properly raised in the motion should be responded to, and in particular the nonmoving party must marshal its proof . . . with respect to any issues identified as the basis for a *Celotex*-type 'no evidence' motion. But the nonmoving party is under no obligation to respond to issues not raised in the motion.").

…

b.      **Regarded As Having An Impairment**

At any rate, Plaintiff's evidence is also sufficient to avoid summary judgment as to the first element of his ADA claim under the alternative "regarded as" test. "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "In regarded-as cases, thus, a plaintiff must show that the employer knew that the employee had an actual impairment or perceived the employee to have an impairment, and that the impairment was not transitory or minor." *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 923 (9th Cir. 2018). *See also Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018) (defining transitory as "expected to last six months or less").

On multiple occasions over a 12-month period, Plaintiff informed Defendants of his injuries. (Doc. 77-2 at 190 [February 7, 2018 health form in which Plaintiff noted that his "nagging injuries" were "personal barriers to exercise"]; *id.* at 198 [Plaintiff's May 2018 fitness protocol worksheet, describing him as "injured"]; *id.* at 209 [June 20, 2018 text exchange in which Plaintiff notified Schell that he was "not clear to run yet"]; *id.* at 199 [Plaintiff's June 2018 fitness protocol worksheet providing that "[c]lient is not cleared to run"]; Doc. 71-3 at 13-14 [October 22, 2018 workers' compensation claim]; Doc. 77-2 at 112-14 [description of an email Plaintiff sent to a District employee on October 23, 2018 informing her that he "injured [his] foot from the continued stress of exercise"]; Doc. 71-3 at 12 [November 1, 2018 "worker's report of injury" stating that Plaintiff injured his left foot, leg, and back in November 2017].) Defendants also extended the date of Plaintiff's retests on multiple occasions because they believed he was unable or not cleared to run. (Doc. 77-2 at 225 [November 8, 2018 email from Plaintiff to Chief Nichols that he is "still injured and ha[s] not been able to prepare for [his] next Treadmill Test that the department has scheduled on November 20th, 2018"]; *id.* at 220 [January 22, 2019 email from Plaintiff to Chief Nichols: "I am not going to make the Treadmill Test you scheduled on

Thursday. . . .  I do not believe that I am cleared by my doctor for that"].)  The Fire Board also requested and received additional medical documentation from Plaintiff confirming that his "current symptomatology prevent[s] him from preparing for and successfully passing his required physical evaluation."  (Doc. 71-4 at 4, 15.)

The Ninth Circuit has held that these sorts of details are sufficient to create a genuine issue of fact at summary judgment in "regarded as" cases.  *See, e.g.*, *Baker v. Roman Cath. Archdiocese of San Diego*, 725 F. App'x 531, 532 (9th Cir. 2018) ("Here, there is evidence in the summary judgment record that the principal Michael Deely: (1) knew that Baker had suffered a concussion at the end of August, because she had told him via email; (2) knew that Baker continued to suffer from dizziness and headaches after the concussion, because Baker said she told him that when she ran into him every week or two; (3) was concerned about Baker's health immediately after the concussion, because he expressed that concern to her; and (4) according to both Baker and Deely, asked about Baker's health when he saw her from time to time.  This evidence could be interpreted by a jury as demonstrating that Deely 'regarded' Baker as having post-concussion headaches and dizziness throughout the relevant time period.").  *See also Alfonso v. Cmty. Bridges, Inc.*, 2024 WL 1071159, *13 (D. Ariz. 2024) (finding a genuine dispute of material fact as to whether the defendant regarded the plaintiff as disabled where the plaintiff told the defendant on multiple occasions over the course of 11 months that she suffered from impairments, the defendant was "aware that Plaintiff needed to take an extended medical leave because of her claimed health issues," and "members of CBI's human resources department expressed sympathy to Plaintiff regarding her 'health struggles'").

Plaintiff's March 2020 application for disability retirement, which listed the date of the disabling event as February 20, 2019 (Doc. 71-2 at 9), and the April 2021 medical record, which listed the date of the injury as November 2019 (Doc. 71-4 at 44-45 ¶ 95), do not undermine this conclusion.  These documents came into existence after Plaintiff's termination and thus shed no light on whether Defendants regarded Plaintiff as disabled before and leading up to his termination.

B.      **Qualified Individual**

1.      The Parties' Arguments

Defendants argue that Plaintiff is not a qualified individual under the ADA because he "fails to establish that any of [his requested] accommodations would have allowed him to obtain a satisfactory METs score and enabled him to safely perform the essential functions of a firefighter."  (Doc. 71 at 13-15.)

Plaintiff responds that he "was a qualified individual under the ADA because he could perform his actual job duties as a Captain prior to and during the time at issue without an accommodation.  He needed an accommodation only with respect to the new fitness policy."  (Doc. 77 at 16.)  Plaintiff also contends that "the running treadmill test itself is not an essential function of Plaintiff's position.  There is no evidence that Plaintiff was unable to perform the essential functions of his job.  His cardiovascular fitness level did not prevent him from being an active-duty firefighter both before and after the new policy, and there was no such evidence introduced." (*Id.*)  At any rate, Plaintiff contends that "had the District simply provided reasonable accommodation he could have continued to perform the duties of a firefighter" and that the year he had to "train and improve his physical fitness" was not an accommodation because he "was injured the entire time . . . and was unable to rest and recuperate." (*Id.* at 17.)  Plaintiff also contends that statements he made in his application for state retirement disability benefits "are entirely consistent with [his] ADA claim; thus there is no discrepancy to reconcile.  Plaintiff did not and was not required to claim that he was totally disabled." (*Id.*, citation omitted.)

In reply, Defendants argue that Plaintiff "admits that his ability to walk, stand, and climb stairs was 'substantially limited.'  Common sense dictates that [Plaintiff] could not perform the essential functions of his position because a firefighter must be able to walk, stand, and climb stairs to perform the job."  (Doc. 78 at 9.)

2.      Analysis

Plaintiff "bears the burden to prove that he is 'qualified.'"  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (citation omitted).  A "qualified individual"

is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." *Bates*, 511 F.3d at 989 (citation omitted).

"Qualification for a position is a two-step inquiry.  The court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position.  The court then considers whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation." *Id.* at 990.  Here, the parties only dispute the second step, which involves two inquiries: (1) identifying the essential functions of Plaintiff's job; and (2) evaluating whether Plaintiff has demonstrated that he could perform those essential functions with or without a reasonable accommodation. *Dark v. Curry Cnty.*, 451 F.3d 1078, 1087-88 (9th Cir. 2006).

"Essential functions are fundamental job duties of the employment position not including the marginal functions of the position." *Bates*, 511 F.3d at 989 (cleaned up). "[A]n employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." *Id.* at 991 (citation omitted).  "[W]hen determining whether a job requirement is an essential function, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001) (cleaned up).  "Where there is conflict in the evidence regarding the essential functions of a position, we conclude that there is a factual dispute, notwithstanding the job descriptions that an employer has prepared." *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009) (cleaned up).

Even though the Court harbors some doubt as to whether Plaintiff will ultimately be

able to prevail on his ADA claim, Defendants have not established an entitlement to summary judgment based on the specific arguments raised in their motion.  All of the arguments in Defendants' motion regarding the "qualified individual" element rest on the premise that obtaining a MET score of at least 12 is an essential function of the job of firefighter, as anything less would place a firefighter "in danger to himself, his coworkers, and the public." (Doc. 71 at 13-15.)  Operating from that premise, Defendants then identify various reasons why there was no reasonable accommodation that would have enabled Plaintiff to perform this essential function.  (*Id.*)  However, because Plaintiff disputes whether achieving a MET score of at least 12 is an essential function of the job, it was Defendants' burden to "put forth evidence establishing those functions."  *Bates*, 511 F.3d at 991.

Defendants have not met that burden.  Defendants have not pointed the Court to the typical sort of evidence an employer in an ADA discrimination would submit to establish the essential functions of the job, such as a written job description, *Cripe*, 261 F.3d at 887, or even a declaration from a knowledgeable representative.  Additionally, Plaintiff has provided the 2022 edition of the guidelines issued by the National Fire Protection Association ("NFPA").  (Doc. 77-2 at 232-42.)  As Plaintiff correctly notes, those guidelines "do not require a 12.0 METs to remain in a firefighting role.  The guidelines now reference 10 METs or lower and even suggest a minimum capacity of 8 METs for someone in Plaintiff's age range (50-59)."  (Doc. 77 at 14, citing Doc. 77-2 at 239.)

Nor is there any merit to Defendants' seeming argument that because the Health Center Policy required a minimum MET score of 12, it follows that achieving such a score is an essential function of the position.  This argument conflates an "essential function" with a "qualification standard."  Qualification standards are "the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired."  *Bates*, 511 F.3d at 989 (citation and quotation marks omitted).  The Ninth Circuit has cautioned that "'[e]ssential

functions' are not to be confused with 'qualification standards,' which an employer may establish for a certain position.   Whereas 'essential functions' are basic 'duties,' 'qualification standards' are 'personal and professional attributes' that may include 'physical, medical and safety' requirements.  The difference is crucial." *Id.* at 990 (cleaned up).   An employee need not "meet each of an employer's established 'qualification standards' . . . to show that he is 'qualified.'   And, indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly cannot meet because of his disability and that forms the very basis of his discrimination challenge." *Id.*

Here, a minimum MET score of 12 is a qualification standard.  Defendants do not offer evidence connecting this threshold to the essential functions of a firefighter captain. *Cf. Harmon v. Clark Cnty.*, 2009 WL 3785528, *4 (D. Nev. 2009) (without evidence regarding "the specific physical demands of Plaintiff's position," "how Plaintiff's apparent cardiovascular problems may have affected his ability to perform his job," and what the fitness test requires, "it is impossible to determine whether the Certificate of Fitness examination was likely to reveal a disability").   Indeed, even under the Health Center Policy, Plaintiff's MET scores did not foreclose the possibility that he could perform the essential functions of the captain position—the Health Center Policy acknowledged that firefighters in Tier 4 could potentially still "work in the firefighting field." (Doc. 71-2 at 23.)

Given these conclusions, it is unnecessary to address the parties' arguments about whether there was any reasonable accommodation that would have allowed Plaintiff to pass the treadmill test.   Defendants offer those arguments solely in attempt to show that Plaintiff was not a "qualified individual" for purposes of the second element of his ADA claim (Doc. 71 at 13-15), but as noted, a "qualified individual" is "an individual who, with *or without* reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8) (emphasis added).  Because a reasonable juror could conclude that achieving a MET score

1   of at least 12 on the treadmill test is not an essential function of the position, it is

2   unnecessary to address the reasonableness of any accommodations needed to meet this

3   qualification standard.

4          Finally, to the extent Defendants argue that walking, standing, and climbing stairs

5   are essential functions of the position, the argument also falls short.  As an initial matter,

6   Defendants did not raise this argument in their motion—instead, they raised it for the first

7   time in their reply.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district

8   court need not consider arguments raised for the first time in a reply brief.").  At any rate,

9   this forfeited argument is insufficiently developed on the current record.  Although

10  Defendants contend that "common sense" indicates that a firefighter must be able to walk,

11  stand, and climb stairs to carry out the essential duties of the position, appeals to common

12  sense are insufficient to satisfy the evidentiary burden that Defendants bear in this context.

13  *Bates*, 511 F.3d at 991.  Additionally, to the extent Defendants seek to satisfy their burden

14  by citing the NFPA standards that Plaintiff attached to his response (Doc. 78 at 9), the cited

15  provisions only require that a firefighter be able to "[c]limb[] at least six flights of stairs or

16  walking," "climb[] ladders" while wearing certain protective gear, and perform during

17  "[u]npredictable, prolonged periods of extreme physical exertion as required."  (Doc. 77-2

18  at 233 [NFPA § 5.1.1(4), (8), (9)].)  Even assuming these constitute essential functions of

19  the job, there is a genuine dispute of fact as to whether Plaintiff could perform those

20  functions at the time of his termination.  Plaintiff's medical records from around that time

21  provide that although he had pain running (Doc. 71-4 at 11-12 [March 2019 evaluation]),

22  he could walk (*id.* at 12 ["[Plaintiff] . . . reported that he had been 'walking two to three

23  miles a day.'"]).  Additionally, Plaintiff achieved a MET score of less than 12 on fitness

24  tests for several years before the Health Center Policy went into effect yet was not removed

25  from duty.  (Doc. 71-2 at 56-57 [June 2015 evaluation where Plaintiff "[met] the medical

26  and physical requirements for modified duty with his/her restrictions"]; Doc. 77-2 at 50

27  [April 2017 medical evaluation where Plaintiff "[met] the medical and physical

28  requirements for full duty with restrictions/concerns").  Given this backdrop, there is a

1   genuine dispute of fact whether Plaintiff is a qualified individual under the ADA.[18]

2   IV.   <u>Punitive Damages</u>

3          In the final section of their motion, Defendants seek summary judgment on any

4   claim for punitive damages, arguing that such damages are not available under the ADEA

5   or the ADA.  (Doc. 71 at 15-16.)  In response, Plaintiff clarifies that he "is not requesting

6   punitive damages for his ADA or ADEA claims but is entitled to liquidated damages under

7   his ADEA claim if Defendants willfully violated his rights under the ADEA."  (Doc. 77 at

8   17-18.)  In reply, Defendants do not address the issue of liquidated damages but reiterate

9   their request for summary judgment on punitive damages.  (Doc. 78 at 10.)

10         In light of Plaintiff's concession, Defendants' request for summary judgment as to

11  any claim for punitive damages is granted.  The Court expresses no opinion as to the

12  availability of liquidated damages.

13         Accordingly,

14         **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 71) is

15  **granted in part and denied in part**.

16         Dated this 18th day of September, 2024.

17

18

19                                                       _____

20                                                       Dominic W. Lanza
                                                         United States District Judge
21

22

23

24

25

26

27  _____

    [18]      As noted, the third element of an ADA claim is that the plaintiff "was discriminated
28  against because of [his] disability."  *Smith*, 727 F.3d at 955.  However, Defendants do not
    challenge the sufficiency of Plaintiff's evidence regarding the third element.